In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-2105

MULCAHY, PAURITSCH, SALVADOR & CO., LTD.,

*Petitioner-Appellant,*

*v.*

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee.*

Appeal from the United States Tax Court.
No. 4901-08—**Richard T. Morrison**, *Judge.*

ARGUED MARCH 30, 2012—DECIDED MAY 17, 2012

Before BAUER, POSNER, and HAMILTON, *Circuit Judges.*

POSNER, *Circuit Judge.* A corporation can deduct from its taxable income a "reasonable allowance for salaries or other compensation for personal services actually rendered." 26 U.S.C. § 162(a)(1); see Treas. Reg. §§ 1.162-7, 1.162-9. But it cannot deduct dividends. They are not an expense, but a distribution to shareholders of corporate income after the corporation has paid corporate income tax. Thus a corporation that can get away with

pretending that a dividend paid to a shareholder is a business expense will have a lower corporate income tax liability. The income tax liability of the recipient of the "salary" will be greater, because dividends are taxed at a substantially lower maximum rate (with irrelevant exceptions) than ordinary income—15 percent versus 35 percent. 26 U.S.C. §§ 1(h)(1), (11), (i)(2). But the offset will not be complete. Corporate revenue paid as salary is deductible from corporate income and so is taxed only once, as income to the recipient, while revenue paid as a dividend is taxed at both the corporate and the personal level. Assume that corporate income is taxed at 34 percent, dividends at 15 percent, and personal income at 35 percent. If paid as a dividend, $100 of corporate income becomes $56.10 in the owner-employee's hands because the corporation pays a 34 percent tax on its income and then the owner-employee pays 15 percent on the $66 dividend, and $100 x .66 x .85 = $56.10. But if recharacterized as salary, the $100 in corporate income becomes $65.00 in the owner-employee's hands. The corporation would deduct the salary expense from its income, thus paying no tax on it; the owner-employee would pay a 35 percent tax; and $100 − (.35 x $100) is $65, which beats $56.10.

Because owner-employees thus have an incentive to recharacterize dividends as salary to the extent that they can get away with the recharacterization, the courts have from time to time to decide whether income denominated as salary is really a dividend and thus has been improperly deducted from the corporation's income. See, e.g., *Menard, Inc. v. Commissioner*, 560 F.3d 620, 621-22

(7th Cir. 2009); *Exacto Spring Corp. v. Commissioner*, 196 F.3d 833, 834 (7th Cir. 1999); *Haffner's Service Stations, Inc. v. Commissioner*, 326 F.3d 1, 3 (1st Cir. 2003); *Eberl's Claim Service, Inc. v. Commissioner*, 249 F.3d 994, 996 (10th Cir. 2001); *LabelGraphics, Inc. v. Commissioner*, 221 F.3d 1091, 1095 (9th Cir. 2000). Invariably the taxpayer in such cases is a closely held corporation in which all (or at least most) of the shareholders draw salaries as employees, because shareholders who did not draw salaries would not be compensated for the dividend reduction that enabled the shareholder-employees to increase their after-tax income. Treas. Reg. § 1.162-7(b)(1); *Exacto Spring Corp. v. Commissioner, supra*, 196 F.3d at 838; *Eberl's Claim Service, Inc. v. Commissioner, supra*, 249 F.3d at 998. And so it is here, but this case is unusual because the employer is a professional services company.

The typical firm organized in the corporate form combines labor and capital inputs to produce goods or services that it sells, and the sales generate revenues that if they exceed the costs of the firm's inputs create profits. Some of the labor inputs into the firm may be contributed by an owner-employee, who is compensated for them in salary though he may also receive a share of the firm's profits in the form of dividends as compensation for his capital inputs. Whether the deduction that the corporation takes for the owner-employee's salary really is a dividend can usually be answered by comparing the corporation's reported income with that of similar corporations, the comparison being stated in terms of percentage return on equity, the standard measure of corporate profitability. See, e.g., *Menard, Inc. v. Commis-*

*sioner*, *supra*, 560 F.3d at 623-24. The higher that return, the stronger the evidence that the owner-employee deserves significant credit for his corporation's increased profitability and thus earns his high salary. Indeed there is a presumption that salary paid an owner-employee is reasonable—hence not a disguised dividend, and hence deductible from corporate income—if the firm generates a higher percentage return on equity than its peers. *Exacto Spring Corp. v. Commissioner*, *supra*, 196 F.3d at 839; see also *Menard, Inc. v. Commissioner*, *supra*, 560 F.3d at 623.

This is the "independent investor" test. Its premise is that an investor who is not an employee will not begrudge the owner-employee his high salary if the equity return is satisfactory; the investor will consider the salary reasonable compensation for the owner-employee's contribution to the company's success. 7 *Mertens Law of Federal Income Taxation* § 25E:1 (2012). But the presumption is rebuttable, since as we noted in the *Menard* case it might be that the "company's success was the result of extraneous factors, such as an unexpected discovery of oil under the company's land." 560 F.3d at 623; see also *Exacto Spring Corp. v. Commissioner*, *supra*, 196 F.3d at 839. When this is a possibility, other factors besides the percentage of return on equity have to be considered, in particular comparable salaries. The closer the owner-employee's salary is to salaries of comparable employees of other companies who are not also owners of their company (or to salaries of non-owner employees of his own firm who make contributions comparable to his to the firm's success), the likelier it is that his salary

was compensation for personal services and not a concealed dividend. 7 *Mertens Law of Federal Income Taxation*, *supra*, §§ 25E:18, 19; 1 Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates & Gifts* ¶ 22.2.2, p. 22-23 (3d ed. 1999).

But what if, as in a typical small professional services firm, the firm's only significant input is the services rendered by its owner-employees? Maybe it has no other employees except a secretary, and only trivial physical assets—a rented office and some office furniture and equipment. Such a firm isn't meaningfully distinct from its employee-owners; their income from their rendition of personal services is almost identical to the firm's income. The firm is a pane of glass between their billings, which are the firm's revenues, and their salaries, which are the firm's costs. To distinguish a return on capital from a return on labor is pointless if the amount of capital is negligible.

It is thus no surprise that most professional-services firms (including firms much larger than in our example) are organized as limited liability companies (LLCs), limited liability partnerships (LLPs), limited partnerships (LPs), small business corporations (S-corps), or other pass-through entities. In those entities as in a general partnership (which differs from the pass-throughs we listed mainly in not limiting partners' personal liability for the entity's debts, and for that reason has largely given way to those other pass-throughs), the company's receipt of income is not a taxable event; instead the income is deemed to pass directly to the owners and is taxed as personal income to them.

The taxpayer in this case is not the very small firm of our example; it is not a "pane of glass." It has physical capital to support some 40 employees in multiple branches, and it has intangible capital in the form of client lists and brand equity—and capital in a solvent firm generates earnings. The taxpayer decided to do business as a conventional corporation (a "C corporation" as it is called) rather than as a pass-through, and this required it to pay corporate income tax if it had income. It contends that it had virtually no income, and so owed virtually no corporate income tax, because its revenues (though substantial—$5 million to $7 million a year) were offset by deductions for business expenses, primarily compensation paid directly or indirectly to its owner-employees, who are three of the firm's accountants—the "founding shareholders," as they are called. Their names form the name of the firm and they owned more than 80 percent of the firm's stock in 2001 (slightly less in the following two years) and received salaries from the firm that year that totaled $323,076. The firm reported taxable income of only $11,279 that year and in the following year it reported a loss of $53,271, and as a result of carrying forward part of that loss it reported zero taxable income the third year.

The Internal Revenue Service did not question the salary deductions, but it disallowed more than $850,000 in "consulting fees" that the firm paid in each of the three years to three entities owned by the founding shareholders—PEM & Associates, Financial Alternatives, Inc., and MPS, Ltd.—which in turn passed the money on to the founding shareholders. Seconded by the Tax Court, the

Internal Revenue Service reclassified the fees as dividends, resulting in a deficiency in corporate income tax of more than $300,000 for 2001 and similar deficiencies for the following two years.

The Tax Court added to the deficiencies the 20 percent statutory penalty for "substantial understatement of income tax," 26 U.S.C. §§ 6662(a), (b)(2), defined as an understatement either greater than $10,000 or greater than 10 percent of the tax due. Treas. Reg. § 1.6662-4(b). The firm's understatement exceeded $280,000 in each year. Reasonable good-faith efforts to determine tax liability—efforts that usually consist in obtaining tax advice from a reputable professional tax adviser—will protect a taxpayer from the imposition of the penalty, 26 U.S.C. § 6664(c)(1); Treas. Reg. §§ 1.6664-4(a), (c)(1); *United States v. Boyle*, 469 U.S. 241, 250-51 (1985); *Richardson v. Commissioner*, 125 F.3d 551, 558 (7th Cir. 1997), provided the adviser has no conflict of interest. *American Boat Co., LLC v. United States*, 583 F.3d 471, 481-82 (7th Cir. 2009). But there was a huge conflict in this case: taking tax advice from oneself. The firm states that it is "a CPA firm employing many individuals who are knowledgeable in income tax matters" and claims to have based its decision to treat the "consulting fees" as salary on their, which is to say on its own, advice.

The Tax Court was correct to reject the firm's argument that the consulting fees were salary expenses. Treating them as salary reduced the firm's income, and thus the return to the equity investors, to zero or below in two of the three tax years at issue, even though, judging

by the salaries received by the founding shareholders, the firm was doing fine. And so the firm flunks the independent-investor test.

We are mindful that Illinois limits equity investments in an accounting firm to the firm's "active participants," 225 ILCS 450/14.3(a) (presumably its accountants), just as only a law firm's lawyers can own equity in the law firm. But the fact that only members of a firm (and hence employees) can contribute capital to it doesn't mean that there is no return on that capital. We know the firm had significant capital, both tangible and intangible, and we are given no reason to think that its capital didn't generate a return that an unconflicted investor would be entitled to a portion of.

Moreover, even if the firm had established that the consulting fees paid to the founding shareholders were reasonable compensation for *something*, to be deductible from corporate income the fees had to be compensation for "personal services actually rendered." 26 U.S.C. § 162(a)(1); Treas. Reg. § 1.162-7(a); 1 Bittker & Lokken, *supra*, ¶ 22.2.1, pp. 22-19 to 22-20; *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1018 (8th Cir. 2012). The firm argues that the consulting fees were not for services rendered to the firm by the related entities, as its tax returns would suggest, but payments for accounting and consulting services provided by the founding shareholders to the firm's clients and thus in effect additional salary. They had been paid indirectly, the firm argues, in order to conceal from the firm's other employees how much of the firm's income was

being appropriated by the founding shareholders. Some (maybe all) of those other employees, including employee-shareholders who are not among the founders, apparently thought that the founders were overpaying themselves.

There is no evidence that the "consulting fees" were compensation for the founding shareholders' accounting and consulting services. If they had been that—rather than appropriations of corporate income—why the need to conceal them? The firm did not treat them as labor expenses: it didn't withhold payroll taxes on them, report them as employee compensation on its W-2s or as non-employee compensation on its 1099-MISC forms, disclose them on the officers' compensation schedule in its form 1120 corporate income tax returns, or keep records that matched the consulting fees to work performed by each founder. "When a person provides both capital and services to an enterprise over an extended period, it is most reasonable to suppose that a reasonable return is being provided for both aspects of the investment, and that a characterization of all fruits of the enterprise as salary is not a true representation of what is happening." 1 Bittker & Lokken, *supra*, ¶ 22.2.2, p. 22-26.

The firm argues that since the "consulting fees" were allocated among the founders in proportion to the number of hours that each worked, those fees could not have been dividends, since dividends are based on ownership rather than on work. But whatever the method of allocation of the firm's income, if the fees were paid out of corporate income—if every compensated hour included a capital return—the firm owed

corporate income tax on the net income hiding in those fees. A corporation cannot avoid tax by using a cockeyed method of distributing profits to its owners.

Remarkably, the firm's lawyers (an *accounting* firm's lawyers) appear not to understand the difference between compensation for services and compensation for capital, as when their reply brief states that the founding shareholders, because they "left funds in the taxpayer over the years to fund working capital," "deserved more in compensation to take that fact into account." True—but the "more" they "deserved" was not compensation "for personal services actually rendered." Contributing capital is not a personal service. Had the founding shareholders lent capital to the company, as it appears they did, they could charge interest and the interest would be deductible by the corporation. They charged no interest.

The firm argues that the value of a professional services corporation is its annual gross revenues, and therefore the contribution that its managers (the founding shareholders in this case) make to the firm's value is best estimated by the year-to-year change in those revenues; and over the three-year tax period the firm's revenues grew by 17.27 percent, justifying, it argues, the high compensation paid the founding shareholders; for an independent investor would be satisfied with that capital appreciation as the return on his investment. But that ignores the firms' costs, which might be growing in tandem with its revenues. And even if the firm had no costs, so that its revenues were pure profit, the firm's value would not be its *annual* revenues. The

value of a firm as a going concern (rather than in liquidation) is the discounted present value of its anticipated future profits. See *Olsen v. Floit*, 219 F.3d 655, 658 (7th Cir. 2000); *In re Prince*, 85 F.3d 314, 319 (7th Cir. 1996); *Lattera v. Commissioner*, 437 F.3d 399, 404 (3d Cir. 2006); Robert F. Reilly & Robert P. Schweihs, "Valuing Accounting Practices," 3 *Valuation Strategies* 20, 25 (May-June 2000). You cannot buy a firm that produces a $1 million profit every year for $1 million; the purchase price would be closer to $20 million (assuming a 5 percent discount rate).

It could be argued that if the only significant costs of a professional services firm are the salaries of its owner-employees, the present discounted value of the firm's future revenues would be a fair estimate of what a new batch of owner-employees would earn from owning the firm, and then the firm's value would approximate its gross revenues. But the new batch would not pay for an existing firm rather than starting its own firm unless the purchase would bring the new owners the existing firm's customer lists, trained staff, or other valuable assets—and valuable assets are capital and yield corporate income.

The firm put on an expert witness, named Marc Rosenberg, who testified that the founding shareholders' pay was comparable to the pay earned by accountant-owners of comparable accounting firms. But all he looked at in making the comparison was firm income per partner ("partner" denoting an owner, like the founding shareholders of the taxpayer in this case)—that is, partner compensation plus the firm's

net income, all divided by the number of partners. This method of estimation could not reveal compensation for personal services rendered by partners in other firms because it did not divide firm income per partner into salary and dividend components. Rosenberg acknowledged that he hadn't tried to estimate the value of the personal services performed by the partners in these other firms or investigated the services performed by the founding shareholders in the taxpayer firm. His testimony was irrelevant and should not have been allowed. *ATA Airlines, Inc. v. Federal Express Corp.*, 665 F.3d 882, 896 (7th Cir. 2011).

We are mindful of the difficulty of valuing a closely held company because its stock is not traded publicly. *Olsen v. Floit, supra*, 219 F.3d at 658; *Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 362-63 (3d Cir. 2002); cf. *United Air Lines, Inc. v. Regional Airports Improvement Corp.*, 564 F.3d 873, 875 (7th Cir. 2009). If the company cannot be valued, neither can the return to the shareholders be calculated as a percentage of that value, and so the independent-investor test is difficult to run. But when a thriving firm that has nontrivial capital reports no corporate income, it is apparent that the firm is understating its tax liability.

We note in closing our puzzlement that the firm chose to organize as a conventional business corporation in the first place. But that was in 1979 and there were fewer pass-through options then than there are now; a general partnership would have been the obvious alternative but it would not have conferred limited liability, which

protects members' personal assets from a firm's creditors. Why the firm continued as a C corporation and sought to avoid double taxation by overstating deductions for business expenses, when reorganizing as a pass-through entity would have achieved the same result without inviting a legal challenge, see 1 Boris I. Bittker & James S. Eustice, *Federal Income Taxation of Corporations and Shareholders* ¶ 5.01[5], p. 5-8 (7th ed. 2006), is a greater puzzle. But "while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not," *Commissioner v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974)—consequences that in this case include a large tax deficiency and a hefty penalty. The Tax Court was correct to disallow the deduction of the "consulting fees" from the firm's taxable income and likewise correct to impose the 20 percent penalty.

That an *accounting* firm should so screw up its taxes is the most remarkable feature of the case.

AFFIRMED.