T.C. Memo. 2016-20

UNITED STATES TAX COURT

BRINKS GILSON & LIONE A PROFESSIONAL CORPORATION,
FORMERLY BRINKS HOFER GILSON & LIONE A PROFESSIONAL
CORPORATION, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14414-13.                    Filed February 10, 2016.

Held: P, an incorporated law firm, liable for accuracy-related penalties for mischaracterizing, as compensation for services, dividends paid to shareholder attorneys. P lacked substantial authority for its treatment of payments as compensation and has failed to show reasonable cause for the resulting underpayments of income tax and that P acted in good faith.

Brian T. Gale and Jay Howard Zimbler, for petitioner.

James M. Cascino, Tracy M. Hogan, and Elizabeth Y. Williams, for respondent.

**[*2]**        MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, <u>Judge</u>:  Respondent determined deficiencies of $245,760 and

$122,353 in petitioner's 2007 and 2008 Federal income tax, respectively, and

accuracy-related penalties of $221,930 and $203,155 for those years, respectively.

The parties entered into a stipulation of settled issues, and the only issue

remaining for decision is whether petitioner is liable for accuracy-related penalties

on underpayments of tax relating to amounts it deducted as officer compensation

that it now agrees were nondeductible dividends.  Unless otherwise indicated, all

section references are to the Internal Revenue Code in effect for the years in issue,

and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

### General Background on Petitioner

Petitioner is an intellectual property law firm organized as a corporation.

When it filed the petition, it maintained its principal offices in Chicago, Illinois.  It

computes its taxable income on the basis of a calendar year, using the cash method

of accounting.  For the years in issue, it prepared its financial statements on that

basis and using that method.  During those years, it employed about 150 attorneys,

of whom about 65 were shareholders.  It also employed a nonattorney staff of

[*3] about 270. Its business and affairs are managed by a board of directors (board).

Ownership of Petitioner's Stock

Petitioner's shareholders hold their shares in the corporation in connection with their employment by the corporation as attorneys. Each shareholder attorney acquired his or her (without distinction, his) shares at a price equal to their book value and is required to sell his shares back to petitioner at a price determined under the same formula upon terminating his employment. Subject to minor exceptions related to the firm's "name partners", each shareholder attorney's proportionate ownership of petitioner's shares (share-ownership percentage) equals his proportionate share of compensation paid by petitioner to its shareholder attorneys. For the years in issue, as for previous years, the board set the yearly compensation to be paid to shareholder attorneys and then determined the adjustments in the shareholder attorneys' share-ownership percentages necessary to reflect changes in proportionate compensation. Adjustments in actual share ownership were made by share redemptions and reissuances.

Petitioner's shareholder attorneys are entitled to dividends as and when declared by the board. For at least 10 years before and including the years in

**[*4]** issue, however, petitioner had not paid a dividend. Upon a liquidation of petitioner, its shareholder attorneys would share in the proceeds.

Compensation Mechanics

For the years in issue, the board met to set compensation and share-ownership percentages in late November or early December of the year preceding the compensation year. Before those meetings, the board settled on a budget for the compensation year. On the basis of that budget, the board determined the amount available for all shareholder attorney compensation for that year. With that amount in mind, it set each shareholder attorney's expected compensation using a number of criteria including hours billed, collections, business generated, and other contributions to the welfare of the corporation. Before finalizing its compensation decisions, the board shared its estimates of total shareholder attorney compensation and each shareholder attorney's expected portion with all of the shareholder attorneys. Because the board's estimate of the amount available for compensation-year payments to shareholder attorneys was only an estimate, each shareholder attorney received during the course of the compensation year only a percentage of his expected compensation (draw), with the expectation of receiving an additional amount (yearend bonus) at the end of the year. The board intended the sum of the shareholder attorneys' yearend bonuses (bonus pool) to

[*5] exhaust book income. With limited exceptions for certain older, less active shareholder attorneys, shareholder attorneys shared in the bonus pool in proportion to their draws (and, likewise, in proportion to their share-ownership percentages). Specifically, for each of the years in issue petitioner calculated the yearend bonus pool--$8,986,608 in 2007 and $13,736,331 in 2008--to equal its book income for the year after subtracting all expenses other than the bonuses. Thus, petitioner's book income was zero for each year: Its income statements showed revenue exactly equal to expenses.

Petitioner treated as employee compensation the amounts it paid to its shareholder attorneys, including the yearend bonuses. In particular, petitioner withheld applicable income and employment taxes, paid the employer's share of employment taxes, and filed appropriate reporting forms, such as Form W-2, Wage and Tax Statement, and Form 941, Employer's Quarterly Federal Tax Return. An independent payroll processing firm prepared petitioner's Forms W-2 for 2007 and 2008 using records and information that petitioner provided. Petitioner then provided the Forms W-2 to McGladrey & Pullen (McGladrey), petitioner's accounting firm. Gary Ropski, petitioner's president during the years in issue, testified at trial that petitioner's board did not consider at all the Federal income tax impact of paying the yearend bonuses. Mr. Ropski acknowledged,

**[\*6]** however, that petitioner's chief financial officer, Lee Rendino, and its accountants were responsible for considering the tax impact of petitioner's activities.

Petitioner's Invested Capital

Petitioner had invested capital, measured by the book value of its shareholders' equity, of about $8 million at the end of 2007 and about $9.3 million at the end of 2008.[1] Petitioner's balance sheets for the years in issue do not show goodwill or other intangible assets. At trial, petitioner's expert witness, legal industry consultant Bradford Hildebrandt, questioned whether the goodwill of a law firm's business is an asset of the firm or, instead, of its individual partners. He opined that clients base hiring decisions on the reputations of individual lawyers rather than those of the firms at which they practice. Nonetheless, upon questioning by the Court, Mr. Hildebrandt admitted that a firm's reputation and customer lists could be valuable entity-level assets, even though determining their precise worth might be difficult.

---

[1]Because petitioner reported zero book income for 2008, the increase in shareholders' equity between 2007 and 2008 was attributable not to retained earnings but instead to capital contributions and the net of proceeds of share issuances and amounts paid in redemption.

[*7] Petitioner's Tax Returns for the Years in Issue

McGladrey prepared petitioner's U.S. corporate income tax returns for the years in issue. At that time, McGladrey was the fifth largest public accounting firm in the United States and held itself out as a leading provider of accounting, tax, and consulting services to middle-market businesses. Petitioner electronically filed its returns for 2007 and 2008 in September 2008 and 2009, respectively. In each return, petitioner included the yearend bonuses it paid to its shareholder attorneys in the amount it claimed as a deduction for officer compensation. Before filing its return for each year, petitioner did not specifically ask McGladrey whether the full amount of the yearend bonuses it paid to shareholder attorneys was deductible as compensation for services, and McGladrey did not comment on the deductibility of the bonuses.

Petitioner's 2007 return reported total income of $91,742,819, taxable income of $539,902, and tax liability of $188,966. Its 2008 return reported total income of $107,019,812, taxable income of $561,075, and tax liability of $196,376. Because petitioner's book income was zero for each year, the taxable income petitioner reported was attributable entirely to items that were treated differently for book and tax purposes.

[*8] Respondent's Examinations of Petitioner's Returns

Petitioner's return for 2006, before the years in issue in the present case, had been examined by Internal Revenue Agent Ray Berg. During the course of that examination, petitioner provided board minutes and financial statements to Mr. Berg. Upon the completion of the examination, petitioner received a letter advising it that no changes had been made to its reported tax liability as a result of the examination.

When respondent later examined petitioner's returns for 2007 and 2008, he disallowed various deductions, including the yearend bonuses petitioner paid to its shareholder attorneys. After negotiations, the parties entered into a closing agreement that provides, among other things, that portions of petitioner's officer compensation deductions for the years in issue--$1,627,000 in 2007 and $1,859,000 in 2008--"should be disallowed and re-characterized as non-deductible dividends". As a result of concessions that petitioner made in settlement, its agreed tax liability is $1,298,618 for 2007 and $1,212,152 for 2008, resulting in underpayments of $1,109,652 and $1,015,776 for 2007 and 2008, respectively.[2]

_____

[2]The deficiencies determined by respondent were based on reduced underpayment amounts because, in accordance with the closing agreement, respondent employed "rough justice adjustments" that take into account the refunds of income and employment taxes that would otherwise have been due to

(continued...)

[*9]                                     OPINION

I.    Background

Because the parties' closing agreement provides that a portion of petitioner's officer compensation deductions for the years in issue "should be disallowed and re-characterized as non-deductible dividends", the deductibility of petitioner's yearend bonuses is not in issue.[3]  The sole issue remaining for our decision is whether petitioner is liable for accuracy-related penalties under section 6662 on the underpayments of tax relating to its deduction of those portions of the yearend bonuses that it has now agreed were nondeductible dividends.

Section 6662(a) and (b)(1) provides for an accuracy-related penalty of 20% of the portion of an underpayment of tax attributable to negligence or disregard of rules and regulations (without distinction, negligence).  Section 6662(a) and (b)(2) provides for the same penalty on the portion of an underpayment of tax

_____

[2](...continued)
petitioner and its shareholders as a result of the recharacterization of compensation as dividends.

[3]Sec. 162(a) allows a deduction for ordinary and necessary business expenses, including reasonable allowances for salaries.  To be deductible, however, amounts paid as salary must be for services "actually rendered."  Sec. 162(a)(1); see also sec. 1.162-7(a), Income Tax Regs. (stating that to be deductible, compensation payments must be reasonable and they must be "in fact payments purely for services").  Ostensible salary payments to shareholder employees that are actually dividends are thus nondeductible.

[*10] attributable to "[a]ny substantial understatement of income tax".  Section 6662(d)(2)(A) defines the term "understatement" as the excess of the tax required to be shown on the return over the amount shown on the return as filed.  In the case of a corporation, an understatement is "substantial" if, as relevant here, it exceeds the lesser of (1) 10% of the tax required to be shown on the return for the tax year or (2) $10 million.  Sec. 6662(d)(1)(B).  An understatement is reduced, however, by the portion attributable to the treatment of an item for which the taxpayer had "substantial authority".  Sec. 6662(d)(2)(B)(i).  Section 6664(c)(1) provides an exception to the imposition of the section 6662(a) accuracy-related penalty if it is shown that there was reasonable cause for the underpayment and the taxpayer acted in good faith.

Petitioner does not dispute that the deficiency to which it has agreed for each of the years in issue exceeds 10% of the agreed income tax it was required to show on its return for the year.[4]  Petitioner argues, however, that it had substantial authority for deducting in full the yearend bonuses it paid to its shareholder attorneys.  In addition, petitioner argues that, because it relied on the services of a reputable accounting firm to prepare its returns for the years in issue, it had

---

[4]Because the tax required to be shown on petitioner's return for each of the years in issue was less than $10 million, the 10% threshold of sec. 6662(d)(1)(B)(i) applies.

**[*11]** reasonable cause to deduct those amounts and acted in good faith in doing so. If petitioner is correct that it had substantial authority for its position, the disallowance of a portion of its claimed officer compensation deduction for each year would not increase its "understatement" within the meaning of section 6662(d)(2)(A). In that case, the substantial understatement penalty would not apply to the portion of the underpayment for each year attributable to the disallowance of part of those deductions, regardless of whether petitioner had reasonable cause and acted in good faith. Moreover, a determination that petitioner had substantial authority for its position would prevent imposition of the negligence penalty as well. Taking a position that has a "reasonable basis" is not negligent, sec. 1.6662-3(b)(1), Income Tax Regs., and substantial authority is a more stringent standard than reasonable basis, sec. 1.6662-4(d)(2), Income Tax Regs. Therefore, we begin by considering whether petitioner had substantial authority for its deduction of the yearend bonuses.

II.    Substantial Authority

The determination of substantial authority requires a weighing of the authorities that support the taxpayer's treatment of an item against the contrary authorities. Id. subpara. (3)(i). A taxpayer can have substantial authority for a position that is unlikely to prevail, as long as the weight of the authorities in

[*12] support of the taxpayer's position is substantial in relation to the weight of any contrary authorities. See id. subpara. (2) (substantial authority standard is less stringent than the more likely than not standard). The regulations describe the required weighing as follows:

> The weight accorded an authority depends on its relevance and persuasiveness, and the type of document providing the authority. For example, a case or revenue ruling having some facts in common with the tax treatment at issue is not particularly relevant if the authority is materially distinguishable on its facts, or is otherwise inapplicable to the tax treatment at issue.

Id. subpara. (3)(ii). The determination of whether a taxpayer's position has substantial authority is made as of the last day of the taxable year to which the return relates and at the time that return is filed. See id. subdiv. (iv)(C). If the position has substantial authority on either date, the taxpayer's understatement is reduced. Id.

A. The Parties' Arguments

Petitioner relies on Law Offices--Richard Ashare, P.C. v. Commissioner, T.C. Memo. 1999-282, 1999 WL 639866, as the principal authority in support of its deduction of yearend bonuses paid to its shareholder attorneys that eliminated its book income for the years in issue. In Ashare, this Court allowed a corporate law firm to deduct an amount it paid to its sole shareholder as compensation that

**[*13]** exceeded the firm's revenues for the year. Petitioner also claims that section 83 and its accompanying regulations, dealing with transfers of property in connection with services, support the proposition that all amounts it pays to its shareholder attorneys should be treated as compensation for services. Further, petitioner cites authorities in other areas of current or prior law that purport to establish that capital is not a material income-producing factor in a professional services business. See Hubbard-Ragsdale Co. v. Dean, 15 F.2d 410 (S.D. Ohio 1926), aff'd per curiam, 15 F.2d 1013 (6th Cir. 1926);[5] sec. 1.704-1(e)(1)(iv), Income Tax Regs.;[6] sec. 1.911-3(b)(3), Income Tax Regs.;[7] sec. 1.1348-3(a)(3)(ii),

---

[5]Hubbard-Ragsdale Co. v. Dean, 15 F.2d 410 (S.D. Ohio 1926), aff'd per curiam, 15 F.2d 1013 (6th Cir. 1926), holds that a corporation engaged in buying and selling livestock on commission was not a "personal service corporation" entitled to be taxed as a partnership under provisions of the Revenue Act of 1918, ch. 18, 40 Stat. 1057. The District Court found that, because capital was a material income-producing factor in the corporation's business, the taxpayer did not meet the statutory definition of personal service corporation. The court distinguished the taxpayer's business from service businesses, such as law firms and medical practices, for which "the use of capital is merely incidental." Id. at 411.

[6]Sec. 1.704-1(e)(1)(iv), Income Tax Regs., provides: "In general, capital is not a material income-producing factor where the income of the business consists principally of fees, commissions, or other compensation for personal services performed by members or employees of the partnership."

[7]Sec. 911(a)(1) excludes from gross income all or a portion of a qualifying individual's "foreign earned income". Sec. 1.911-3(b)(3), Income Tax Regs.,

(continued...)

**[\*14]** Income Tax Regs.;[8] sec. 1.1361-2(e)(2), Income Tax Regs. (before removal by T.D. 8104, 1986-2 C.B. 153).[9] Finally, petitioner argues that, under substance-over-form principles, the stock held by its shareholder attorneys should be treated as debt, so that the portion of the yearend bonuses determined to be nondeductible as compensation should nonetheless have been deductible as interest.

---

[7](...continued)
treats as "earned income" "all fees received by an individual engaged in a professional occupation (such as doctor or lawyer) in the performance of professional activities." The treatment of the fees as earned income applies "even though the individual employs assistants to perform part or all of the services, provided the patients or clients are those of the individual and look to the individual as the person responsible for the services rendered." Id.

[8]Sec. 1.1348-3(a)(3)(i), Income Tax Regs., limited to 30% the portion of an individual's income from an unincorporated business that could be treated as earned income, for purposes of sec. 1348, which (before its repeal in 1981) limited the rate of tax applicable to earned income. The 30% limit on the amount of business income that could be treated as earned income applied if "both personal services and capital are material income-producing factors". Id. Sec. 1.1348-3(a)(3)(ii), Income Tax Regs., provides that "the practice of his profession by a doctor, dentist, lawyer, architect, or accountant will not, as such, be treated as a trade or business in which capital is a material income-producing factor".

[9]Sec. 1361 of the Internal Revenue Code of 1954 (before adoption of the modern subchapter S rules) allowed unincorporated businesses that met specified conditions to elect to be taxed as domestic corporations. Sec. 1.1361-2(e)(2), Income Tax Regs., provided that "an enterprise engaged in rendering professional services such as law, accounting, medicine, or engineering, ordinarily is not an enterprise in which capital is a material income-producing factor." Therefore, these enterprises were generally not eligible to elect to be treated as domestic corporations. See sec. 1361(b)(4) (before repeal in 1966).

[*15] Petitioner spends most of its effort, however, trying to distinguish the authorities relied on by respondent. Respondent claims that amounts paid to shareholder employees of a corporation do not qualify as deductible compensation to the extent that the payments are funded by earnings attributable to the services of nonshareholder employees or to the use of the corporation's intangible assets or other capital. Instead, says respondent, amounts paid to shareholder employees that are attributable to those sources must be nondeductible dividends. In support of its position, respondent relies primarily on this Court's opinion in Pediatric Surgical Assocs., P.C. v. Commissioner, T.C. Memo. 2001-81, and that of the U.S. Court of Appeals for the Seventh Circuit in Mulcahy, Pauritsch, Salvador & Co. v. Commissioner, 680 F.3d 867 (7th Cir. 2012), aff'g T.C. Memo. 2011-74. In Pediatric Surgical, we determined that compensation payments to shareholder employees attributable to the services of nonshareholders were nondeductible dividends. In Mulcahy, the Court of Appeals for the Seventh Circuit denied a corporation's deduction of consulting fees paid to entities owned by the taxpayer's founding shareholders. The taxpayer sought to justify the deduction of the consulting fees on the grounds that they were, in effect, additional compensation to its shareholders. The Court of Appeals upheld this Court's disallowance of the deduction, reasoning that "[t]reating * * * [the consulting fees] as salary reduced

[*16] the firm's income, and thus the return to the equity investors, to zero or below in two of the three tax years at issue, even though * * * the firm was doing fine." Mulcahy, Pauritsch, Salvador & Co. v. Commissioner, 680 F.3d at 872. "[W]hen a thriving firm that has nontrivial capital reports no corporate income," the court observed, "it is apparent that the firm is understating its tax liability." Id. at 874. Presumably, respondent emphasizes Mulcahy because, absent a stipulation to the contrary, appeal of the present case would lie with the Court of Appeals for the Seventh Circuit. See sec. 7482(b)(1)(B) (venue of appeal of Tax Court decision involving a corporation is the U.S. Court of Appeals for the circuit in which the taxpayer's principal place of business or principal office is located).

Petitioner argues that its case is distinguishable from Pediatric Surgical because any "profit" it makes from the services of nonshareholder attorneys can justifiably be paid to its shareholder attorneys in consideration for business generation and other nonbillable services. Petitioner attempts to distinguish Mulcahy on the basis of the allegedly unique nature of its shareholder attorneys' interests. In particular, petitioner argues that, because its shareholder attorneys receive their stock in connection with their employment and must sell it back to petitioner at a price equal to its cash book value, the shares they hold do not represent "real" equity interests that entitle them to a return on their invested

[*17] capital.  In addition, petitioner observes that, because <u>Mulcahy</u> was decided after it filed its returns for the years in issue, the case cannot be taken into account in assessing the relative weight of authorities for and against its position.  <u>See</u> sec. 1.6662-4(d)(3)(iv)(C), Income Tax Regs.

  B. <u>The Centrality of the "Independent Investor Test"</u>

The principle applied in <u>Mulcahy</u> is well established in the law and grounded in basic economics:  The owners of an enterprise with significant capital are entitled to a return on their investments.  Thus, a corporation's consistent payment of salaries to shareholder employees in amounts that leave insufficient funds available to provide an adequate return to the shareholders on their invested capital indicates that a portion of the amounts paid as salaries is actually distributions of earnings.  Well before the years in issue, an increasing number of Federal Courts of Appeals, including the Court of Appeals for the Seventh Circuit, were moving away from a multifactor analysis in assessing the deductibility of amounts paid as compensation to shareholder employees and focusing on the effect of the payments on the returns available to the shareholders on their capital.  <u>See</u> <u>Exacto Spring Corp. v. Commissioner</u>, 196 F.3d 833, 838 (7th Cir. 1999), <u>rev'g</u> <u>Heitz v. Commissioner</u>, T.C. Memo. 1998-220; <u>Rapco, Inc. v. Commissioner</u>, 85 F.3d 950, 954-955 (2d Cir. 1996), <u>aff'g</u> T.C. Memo. 1995-128;

[*18] Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1245 (9th Cir. 1983), rev'g and remanding T.C. Memo. 1980-282; see also Escrow Connection, Inc. v. Commissioner, T.C. Memo. 1997-17, 1997 WL 5791.  Therefore, the fact that Mulcahy itself is not "authority" for present purposes is of little consequence.

The Court of Appeals for the Seventh Circuit and the other courts that have assessed compensation paid to shareholder employees by its effect on the returns available to shareholders' capital refer to the governing inquiry as the "independent investor test".  Exacto Spring Corp. v. Commissioner, 196 F.3d at 838; Dexsil Corp. v. Commissioner, 147 F.3d 96, 100-101 (2d Cir. 1998), vacating and remanding T.C. Memo. 1995-135.  The test recognizes that shareholder employees may be economically indifferent to whether payments they receive from their corporation are labeled as compensation or dividends.  From a tax standpoint, however, only compensation is deductible to the corporation; dividends are not.  Therefore, the shareholder employees and their corporations generally have a bias toward labeling payments as compensation rather than dividends, without the arm's-length check that would be in place if nonemployees owned significant interests in the corporation.  Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1322-1323 (5th Cir. 1987), aff'g T.C. Memo. 1985-267; Elliotts, Inc. v. Commissioner, 716 F.2d at 1243.  Thus, the courts consider

[*19] whether ostensible salary payments to shareholder employees meet the standards for deductibility by taking the perspective of a hypothetical "independent investor" who is not also an employee.

## C.     Application of the Independent Investor Test

Ostensible compensation payments made to shareholder employees by a corporation with significant capital that zero out the corporation's income and leave no return on the shareholders' investments fail the independent investor test. As the Court of Appeals for the Ninth Circuit observed in Elliotts, Inc. v. Commissioner, 716 F.2d at 1247: "If the bulk of the corporation's earnings are being paid out in the form of compensation, so that the corporate profits, after payment of the compensation, do not represent a reasonable return on the shareholder's equity in the corporation, then an independent shareholder would probably not approve of the compensation arrangement."  See also Dexsil Corp. v. Commissioner, 147 F.3d at 101; Escrow Connection, Inc. v. Commissioner, 1997 WL 5791, at *10 (return on equity of 0% would not satisfy an independent investor); Nor-Cal Adjusters v. Commissioner, T.C. Memo. 1971-200, 1971 Tax Ct. Memo LEXIS 132, at *21 (inactive shareholder would not have forgone a return on invested capital while nearly all of the corporation's income was paid out as salaries and bonuses), aff'd, 503 F.2d 359 (9th Cir. 1974).

[*20] The record establishes that petitioner had substantial capital even without regard to any intangible assets. At trial, petitioner's expert witness, Mr. Hildebrandt, admitted that a firm's reputation and customer lists could be valuable entity-level assets. For present purposes, however, we need not identify and attempt to value intangible assets that belong to petitioner rather than its shareholder attorneys. Regardless of the possibility that petitioner might own valuable intangible assets, it had invested capital, measured by the book value of its shareholders' equity, of about $8 million at the end of 2007 and about $9.3 million at the end of 2008.[10]

Invested capital of this magnitude cannot be disregarded in determining whether ostensible compensation paid to shareholder employees is really a distribution of earnings. We do not believe that petitioner's shareholder attorneys, were they not also employees, would have forgone any return on invested capital that at least approached, if it did not exceed $10 million. Thus, petitioner's practice of paying out yearend bonuses to its shareholder attorneys that eliminated its book income fails the independent investor test.

---

[10]Because petitioner used the cash method in keeping its books, its shareholders' equity did not include any excess of receivables over payables.

**[*21]** D.     Petitioner's Claimed Exemption From the Independent Investor Test

The specific circumstances of the present case do not prevent the application of the independent investor test.  Petitioner observes that its shareholder attorneys hold their stock in the corporation in connection with their employment, they acquire their stock at a price equal to its cash book value, and they must sell their stock back to petitioner at a price determined under the same formula upon terminating their employment.  Petitioner suggests that, as a result of this arrangement, its shareholder attorneys lack the normal rights of equity owners.

Contrary to petitioner's argument, the use of book value as a proxy for market value for the issuance and redemption of shares in a closely held corporation to avoid the practical difficulties of more precise valuation hardly means that the shareholder attorneys do not really own the corporation and are not entitled to a return on their invested capital.  Any shareholders who are not also employees would generally demand such a return.

The provisions of section 83 and its accompanying regulations, rather than supporting petitioner's argument, actually undermine it.  Petitioner purports to rely on rules that determine when property is considered to have been "transferred" by an employer to an employee.  Under those rules, a transfer may not have occurred if, upon termination of his or her employment, the employee is required to return

**[*22]** the property to the employer for a price that "does not approach the fair market value of the property at the time of surrender."  Sec. 1.83-3(a)(3), (5), Income Tax Regs.  Petitioner suggests that the obligation that its shareholder attorneys sell back their stock upon termination of their employment in exchange for the book value of the stock means that the stock was never "transferred".  Consequently, according to petitioner, all amounts it pays to its shareholders--even any amounts actually designated as dividends--must be treated as compensation for services.  See id. sec. 1.83-1(a)(1).

But petitioner is mistaken in its claim that the book value of one of its shares does not approach its fair market value.  Section 1.83-5(a), Income Tax Regs., provides:  "If stock in a corporation is subject to a nonlapse restriction which requires the transferee to sell such stock only at a formula price based on book value * * *, the price so determined will ordinarily be regarded as determinative of the fair market value of such property for purposes of section 83."  Thus, the examples cited by petitioner, section 1.83-3(a)(7), Examples (3) and (4), Income Tax Regs., are readily distinguishable.  They involve requirements to resell stock upon termination of employment for amounts that are demonstrably below the stock's fair market value.  Section 1.83-5(c), Example (1), Income Tax Regs., is more on point.  In that example, an employee's obligation to resell stock

**[*23]** to his employer at its then-existing book value did not prevent recognition of the transfer of the stock to the employee.

More generally, petitioner's argument that its shareholder attorneys have no real equity interests in the corporation that would justify a return on invested capital proves too much. If petitioner's shareholder attorneys are not its owners, who are? If the shareholder attorneys do not bear the risk of loss from declines in the value of its assets, who does? The use of book value as a proxy for fair market value deprives the shareholder attorneys of the right to share in unrealized appreciation upon selling their stock--although they are correspondingly not required to pay for unrealized appreciation upon buying the stock. But acceptance of these concessions to avoid difficult valuation issues does not compel the shareholder attorneys to forgo, in addition, any current return on their investments based on the corporation's profitable use of its assets in conducting its business. Petitioner's arrangement effectively provides its shareholder attorneys with a return on their capital through amounts designated as compensation. Were this not the case, we do not believe the shareholder attorneys would be willing to forgo any return on their investments.

**[*24]** E.    Other Authorities Cited by Petitioner

The other authorities petitioner cites do not refute the general principle that the owners of an enterprise with significant capital are economically entitled to a return on their investments.  Contrary to petitioner's claim, Law Offices--Richard Ashare, P.C. v. Commissioner, 1999 WL 639866, does not demonstrate that an incorporated law firm with significant capital can pay out compensation that eliminates book income.  Although we allowed the taxpayer in Ashare to deduct compensation that exceeded the firm's revenues for the year in issue (1993), the taxpayer in that case did not consistently pay compensation that had the intended effect of eliminating book income.  The firm had reported substantial income for 1990, three years before the year in issue.  Thus, as we observed:  "[T]he board knew how to limit Mr. Ashare's compensation to the value of his uncompensated services as of the end of each year."  Id. at *9.  The failure of the firm "to inflate Mr. Ashare's compensation", despite having "the opportunity, the means, and a strong tax incentive" to do so, indicated that "the board was set on establishing Mr. Ashare's compensation at its fair value."  Id.  The firm's deficit in retained earnings and its failure to pay dividends suggested that, on a cumulative basis, if not year by year, the firm did pay out all of its earnings as compensation.  But, in

[*25] contrast to petitioner in the present case, the firm in <u>Ashare</u> had minimal

capital: Its shareholder had invested only $1,000 in the corporation.[11]

The authorities that purport to establish that capital is not a material income-

producing factor in a professional services business deserve little or no weight.

None of those authorities address the deductibility of compensation paid to

shareholder employees.[12] Several involve statutory provisions that have long

---

[11]As petitioner observes, the taxpayer in <u>Law Offices--Richard Ashare, P.C. v. Commissioner</u>, T.C. Memo. 1999-282, 1999 WL 639866, in connection with an audit of its returns for 1990, 1991, 1992, agreed to treat as constructive dividends a portion of the compensation it paid to its shareholder in each of those years. Petitioner reasons that the taxpayer's concession demonstrates the existence of "tangible or intangible capital." Instead, the taxpayer's retained earnings from the end of 1990 to the beginning of 1993 resulted from its board's decision to retain a portion of the profit it earned in 1990 "for 'the reasonably anticipated needs of the business for the forthcoming years.'" <u>Id.</u>, 1999 WL 639866, at *5. The taxpayer's profit in 1990 reflected the settlement of its principal case. After the settlement, however, a "tremendous amount of work" remained to be done administering the settlement fund. <u>Id.</u> at *3. The board's action proved to be farsighted: By the end of 1993, the taxpayer had incurred expenses sufficient to eliminate its retained earnings and produce a deficit of $89,855. <u>Id.</u> at *2. Thus, the taxpayer's retained earnings were apparently attributable not to capital invested by its shareholder but to its receipt of legal fees from the settlement of its principal case before the performance of all of the work for which those fees served as compensation. If the taxpayer had distributed to its shareholder the earnings it retained at the end of 1990, it would have been left with insufficient resources to pay all of its expenses before winding up.

[12]Petitioner may be correct that, as a result of sec. 1.911-3(b)(3), Income Tax Regs., the exclusion of foreign professional fees under sec. 911(a)(1) applies to amounts attributable to invested capital. But the possibility that, in some

(continued...)

**[\*26]** since been repealed.[13]  Most simply make observations about what is

generally the case in regard to professional service businesses.[14]  Thus, none of the

---

[12](...continued)
contexts, the law forgoes an effort to determine that portion of an attorney's professional services income attributable to capital does not justify treating as deductible compensation payments made by a corporate law firm to shareholder attorneys that eliminate its book income and leave no return to the shareholders on material amounts of invested capital.  Cf. Exacto Spring Corp. v. Commissioner, 196 F.3d 833, 835 (7th Cir. 1999) ("[T]he primary purpose of section 162(a)(1) * * * is to prevent dividends * * * which are not deductible from corporate income, from being disguised as salary, which is."), rev'g Heitz v. Commissioner, T.C. Memo. 1998-220.

[13]Hubbard-Ragsdale Co., 15 F.2d 410, addressed provisions of the Revenue Act of 1918.  Analogous provisions were included in the Revenue Act of 1921, but not subsequent acts.  Sec. 1361 of the Internal Revenue Code of 1954 was repealed in 1966.  Act of Apr. 14, 1966, Pub. L. No. 89-389, sec. 4(b)(1), 80 Stat. at 116.  The limit on the rate of tax applicable to earned income provided by sec. 1348 was repealed by the Economic Recovery Tax Act of 1981, Pub. L. No. 97-34, sec. 101(c)(1), 95 Stat. at 183.

[14]The observation, in dictum, of the U.S. District Court for the Southern District of Ohio in Hubbard-Ragsdale, 15 F.2d at 411, that the use of capital by law firms and similar service businesses is "merely incidental" does not establish that a law firm that in fact has significant capital need not provide its owners with a return on that capital.

Sec. 1.704-1(e)(1)(iv), Income Tax Regs., and sec. 1.1361-2(e)(2), Income Tax Regs. (before removal by T.D. 8104, 1986-2 C.B. 153), simply provide generalizations about the materiality of capital in a personal services business as an income-producing factor.  As a result of sec. 1.704-1(e)(1)(iv), Income Tax Regs., the safe harbor of sec. 704(e)(1) will generally not apply to require the recognition as a partner of any person who owns a capital interest in a partnership whose income consists primarily of compensation for personal services performed

(continued...)

**[*27]** authorities support the proposition that a corporation with substantial capital can pay deductible compensation to its shareholder employees in amounts that leave no return to the shareholders on their investments in the corporation.

F.    <u>Petitioner's Claim That Its Stock Is Really Debt</u>

We can readily dismiss petitioner's claim that the portion of the yearend bonuses determined to be nondeductible as compensation should nonetheless have been deductible as interest. We have already rejected petitioner's argument that its stock is not real equity. Despite a departing shareholder's obligation to sell his stock back to petitioner at cash book value, shares of petitioner's stock lack the hallmark characteristics of debt. <u>Cf.</u> <u>Gilbert v. Commissioner</u>, 248 F.2d 399, 402 (2d Cir. 1957) ("The classic debt is an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest

---

[14](...continued)
by its members or employees. But the application of sec. 704(e)(1) to a law firm partnership would seldom matter, given that the primary purpose of that section is to validate interests in family partnerships acquired by gift. S. Rept. No. 82-781 (1951), 1951-2 C.B. 458, 485-487; H.R. Rept. No. 82-586 (1951), 1951-2 C.B. 357, 380-381.

The classification of a law practice as a business in which capital is not a material income-producing factor by sec. 1.1348-3(a)(3)(ii), Income Tax Regs., did not mean that <u>all</u> of an attorney's income from his practice was treated as earned income and that any return on invested capital was ignored. It simply rendered inapplicable the 30% limitation imposed by sec. 1.1348-3(a)(3)(i), Income Tax Regs., on the amount that could be treated as earned income.

[*28] payable regardless of the debtor's income or lack thereof."), remanding T.C. Memo. 1956-137.[15]

G.    Weighing the Authorities

Having engaged in the weighing process required by section 1.6662-4(d)(3)(ii), Income Tax Regs., we conclude that the authorities that support petitioner's deduction of the full amount of the yearend bonuses it paid to shareholder attorneys are not substantial when weighed against the contrary authorities. The independent investor test weighs strongly against the claimed deductions. Petitioner's efforts to characterize its situation as unique do not persuade us. If the hypothetical independent investor had provided the capital demonstrated by the cash book value of petitioner's shares--even leaving aside the possibility of valuable firm-owned intangible assets--the investor would have demanded a return on that capital and would not have tolerated petitioner's consistent practice of paying compensation that zeroed out its income. By contrast, the authorities cited by petitioner are either "materially distinguishable on

---

[15]Wilshire & W. Sandwiches, Inc. v. Commissioner, 175 F.2d 718 (9th Cir. 1949), rev'g T.C. Memo. 1948-123, cited by petitioner, is readily distinguishable. In that case, the U.S. Court of Appeals for the Ninth Circuit, in upholding interest deductions claimed on advances made by the shareholders of a corporation in proportion to their stock ownership, found "all the elements of a debtor and creditor relationship". Id. at 720.

**[\*29]** * * * [their] facts, or * * * [are] otherwise inapplicable to the tax treatment at issue." Cf. id. Therefore, those authorities are not "particularly relevant". Id.

We do not doubt the critical value of the services provided by employees of a professional services firm. Indeed, the employees' services may be far more important, as a factor of production, than the capital contributed by the firm's owners. Recognition of those basic economic realities might justify the payment of compensation that constitutes the vast majority of the firm's profits, after payment of other expenses--as long as the remaining net income still provides an adequate return on invested capital. But petitioner did not have substantial authority for the deduction of amounts paid as compensation that completely eliminated its income and left its shareholder attorneys with no return on their invested capital.

Because petitioner did not have substantial authority for its treatment of the yearend bonuses it paid during the years in issue, the agreed disallowance of a portion of the deductions petitioner claimed for those payments increased a "substantial understatement", within the meaning of section 6662(d)(1)(B), for each year. Therefore, we need not determine whether the underpayments resulting from that disallowance are attributable to negligence. Cf. sec. 6662(b)(1). The accuracy-related penalties asserted by respondent will apply unless petitioner had

[*30] reasonable cause for its treatment of the yearend bonuses and acted in good faith in pursuing that treatment.

III.     Reasonable Cause and Good Faith

Petitioner argues that, even if it lacked substantial authority for deducting in full the yearend bonuses it paid to its shareholder attorneys during the years in issue, respondent erred in imposing the accuracy-related penalty of section 6662(a) because petitioner had reasonable cause and acted in good faith in claiming the deductions.  See sec. 6664(c)(1).  In that regard, petitioner alleges that its reliance on McGladrey to prepare its returns for the years in issue constituted reasonable cause and demonstrated good faith.

Petitioner's argument that it reasonably relied on McGladrey fails for two reasons.  First, the record provides no evidence that McGladrey advised petitioner regarding the deductibility of the yearend bonuses.  Second, in characterizing as compensation for services amounts that have been determined to be dividends, petitioner failed to provide McGladrey with accurate information.

A taxpayer's reliance on the professional advice of an attorney or an accountant may constitute reasonable cause and good faith.  As a general rule, "[t]he determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts

[*31] and circumstances." Sec. 1.6664-4(b)(1), Income Tax Regs. In making that determination, the "most important factor" is usually "the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." Id. Reliance on the advice of a professional tax adviser may constitute reasonable cause and good faith "if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." Id.

Petitioner argues that McGladrey's failure to apprise it of any issue concerning the deductibility of the yearend bonuses constituted "advice" on which it reasonably relied. The regulations define advice as "any communication * * * setting forth the analysis or conclusion of a person, other than the taxpayer, provided to (or for the benefit of) the taxpayer and on which the taxpayer relies * * * with respect to the imposition of the section 6662 accuracy-related penalty." Id. para. (c)(2). The parties have stipulated that, before filing its return for each of the years in issue, petitioner did not specifically ask McGladrey whether the full amount of the yearend bonuses it paid to shareholder attorneys was deductible as compensation for services and McGladrey did not comment on the deductibility of the bonuses. In effect, petitioner argues that silence can be a "communication". In that regard, petitioner observes that the regulations do not require advice to take "any particular form." See id.

**[\*32]** While the regulations allow flexibility regarding the <u>form</u> of advice, they provide detailed requirements for the <u>content</u> of advice that can constitute reasonable cause and good faith. For example, reliable advice must be "based upon all pertinent facts and circumstances", it must take into account the taxpayer's purposes for its actions, and it cannot be based on unreasonable assumptions. <u>Id.</u> subpara. (1)(i) and (ii).

In prescribing detailed rules regarding the content of professional advice on which a taxpayer can rely, the regulations necessarily contemplate advice that, in some form, involves an explicit communication. Silence cannot qualify as advice because there is no way to know whether an adviser, in failing to raise an issue, considered all of the relevant facts and circumstances, including the taxpayer's subjective motivation. Indeed, an adviser's failure to raise an issue does not prove that the adviser even considered the issue, much less engaged in any analysis, or reached a conclusion. As we observed in <u>Neonatology Assocs., P.A. v. Commissioner</u>, 115 T.C. 43, 100 (2000), <u>aff'd</u>, 299 F.3d 221 (3d Cir. 2002): "The mere fact that a certified public accountant has prepared a tax return does not mean that he or she has opined on any or all of the items reported therein." Thus, we conclude that McGladrey's failure to raise concerns about the deductibility of

[*33] the yearend bonuses did not constitute "advice" within the meaning of section 1.6664-4(c), Income Tax Regs.

Although preparation of a taxpayer's return by a certified public accountant does not provide carte blanche protection against substantial understatement or negligence penalties, our cases recognize that, in some circumstances, a taxpayer's reliance on a competent and experienced accountant in the preparation of the taxpayer's return may constitute reasonable cause and good faith. To show good faith reliance, however, "the taxpayer must establish that the return preparer was supplied with all necessary information and the incorrect return was a result of the preparer's mistakes." Weis v. Commissioner, 94 T.C. 473, 487 (1990); see also Westbrook v. Commissioner, 68 F.3d 868, 881 (5th Cir. 1995), aff'g T.C. Memo. 1993-634; Enoch v. Commissioner, 57 T.C. 781, 802 (1972) ("The ultimate responsibility for a correct return lies with the taxpayer, who must at least furnish the necessary information to his agent who prepared the return.").

Petitioner could not have relied in good faith on McGladrey's preparation of its returns for the years in issue because it provided McGladrey with inaccurate information. The error that led to the claiming of the disallowed deduction was, in the first instance, petitioner's.

[*34] Petitioner consistently followed a system of computing yearend bonuses that disregarded the value of its shareholder attorneys' interests in the capital of the firm and inappropriately treated as compensation amounts that eliminated the firm's book income. The record provides no evidence that petitioner based that practice on the advice of McGladrey or any other qualified tax professional. Although petitioner offered no evidence as to why it adopted its practice of paying yearend bonuses, it is difficult to imagine reasons that are not tax related. Because the proportionate ownership interests of petitioners' shareholder attorneys are (with minor exceptions) identical to their proportionate shares of compensation, the characterization of a distribution as either a dividend or additional compensation has no apparent economic consequence. Petitioner's shareholder attorneys would receive the same amounts either way. Petitioner argues that the board awarded yearend bonuses that exactly zeroed out book income "because the Board believed this approach was an appropriate manner in which to compensate its shareholders for their services." But it would be a striking coincidence if, year after year, the actual value of the services provided by petitioner's shareholder attorneys <u>exactly</u> equaled the amounts necessary to eliminate petitioner's book income. The only apparent consequence of characterizing as additional compensation amounts that would otherwise be available for distribution as

[*35] dividends is to reduce petitioner's corporate income tax liability. Therefore, while it may be true, as petitioner claims, that the board did not consider the Federal income tax consequences of its method of determining yearend bonuses, we doubt that taxes were ignored in the initial design of that method.

Because petitioner initiated for its own reasons--whatever those reasons might have been--the practice of paying yearend bonuses that eliminated its book income, any culpability of McGladrey was secondary, in failing to recognize petitioner's erroneous characterization of part of the yearend bonuses. As a general matter, in the fulfillment of professional responsibilities, an accountant preparing or signing a return is entitled to rely on information furnished by the taxpayer and has only a limited obligation to make inquiries in the case of manifest errors. See 31 C.F.R. sec. 10.34(d) (2008) (duties of return preparers under rules governing practice before Internal Revenue Service, effective for returns filed after September 26, 2007); id. sec. 10.34(c) (same, before amendment by T.D. 9359, 2007-2 C.B. 931); American Institute of Certified Public Accountants, Statement on Standards for Tax Services No. 3, Certain Procedural Aspects of Preparing Returns (2000); see also Whitehouse Hotel Ltd. P'ship v. Commissioner, 139 T.C. 304, 359-360 (2012) (taking into account relevant professional standards in evaluating a taxpayer's ability to rely on return preparer),

**[\*36]** aff'd in part, vacated in part and remanded, 755 F.3d 236 (5th Cir. 2014). McGladrey's failure to bring to petitioner's attention the possible mischaracterization of the yearend bonuses does not absolve petitioner of responsibility because the mischaracterization was petitioner's doing in the first place. Indeed, petitioner provided to McGladrey Forms W-2 that characterized the amounts paid to shareholder attorneys as employee compensation. Therefore, petitioner's reliance on McGladrey in preparing its returns for the years in issue does not constitute reasonable cause and good faith and does not relieve petitioner of liability for the accuracy-related penalty.

Petitioner argues that the "no-change" letter it received at the conclusion of the audit of its 2006 return helps to show that its treatment of the yearend bonuses was not "too good to be true", and that, consequently, its reliance on McGladrey was reasonable. Petitioner concedes, however, that the no-change letter is not "of itself * * * sufficient to establish reasonable cause and good faith." The record presents no evidence that Mr. Berg, the agent who examined petitioner's 2006 return, specifically considered the deductibility of any yearend bonus paid in that year. Moreover, the evidence introduced does not clearly establish that Mr. Berg was provided with sufficient information to bring the issue to his attention. Petitioner failed to introduce the board minutes provided to Mr. Berg that

[*37] petitioner's chief financial officer, Mr. Rendino, alleged would have described petitioner's practice of awarding yearend bonuses designed to zero out book income. Similarly, petitioner failed to introduce the financial statements provided to Mr. Berg. Even assuming that petitioner's income statement for 2006, like those for 2007 and 2008, showed revenue exactly equal to expenses, it would not necessarily have identified the yearend bonuses as the factor that produced that coincidence. Moreover, regardless of the 2006 no-change letter, we have already concluded that petitioner's reliance on McGladrey did not constitute reasonable cause or good faith because McGladrey did not provide petitioner with advice regarding the deductibility of the yearend bonuses, while the information that petitioner provided to McGladrey was inaccurate in characterizing as compensation for services amounts that have been determined to be dividends.

IV.  Conclusion

For the reasons explained above, petitioner failed to show that it had reasonable cause for deducting in full the yearend bonuses it paid to its shareholder attorneys in the years in issue or that it acted in good faith in claiming those deductions. Therefore, section 6664(c)(1) provides petitioner with no defense to the imposition of accuracy-related penalties. Because we have determined that petitioner did not have substantial authority for the deductions in

**[\*38]** issue and because, consequently, the parties' agreed treatment of part of the bonus in each year as a nondeductible dividend increased a "substantial understatement", within the meaning of section 6662(d)(1)(A), the accuracy-related penalty applies to the portion of petitioner's underpayment for each year attributable to the recharacterization of part of the bonuses.

Decision will be entered under

Rule 155.
