T.C. Memo. 2021-8

UNITED STATES TAX COURT

ASPRO, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17494-17.                    Filed January 21, 2021.

<u>Robert J. Murray</u>, <u>Brian J. Brislen</u>, <u>Joseph J. Borghoff</u>, and <u>Adam R. Feeney</u>, for petitioner.

<u>Courtney L. Frola</u>, <u>M. Jeanne Peterson</u>, and <u>William R. Davis, Jr.</u>, for respondent.

**[*2]** MEMORANDUM FINDINGS OF FACT AND OPINION

PUGH, <u>Judge</u>:  Respondent determined the following income tax deficiencies in a notice of deficiency issued to petitioner on June 30, 2017:[1]

| Tax year | Deficiency |
|----------|-----------|
| 2012 | $370,424 |
| 2013 | 544,131 |
| 2014 | 556,920 |

The issue for decision is whether petitioner is entitled to deductions for management fees paid to its three shareholders, Milton Dakovich, Jackson Enterprises Corp., and Manatt's Enterprises, Ltd., for the tax years ending November 30, 2012 (tax year 2012), November 30, 2013 (tax year 2013), and November 30, 2014 (tax year 2014).  The deductions claimed are as follows:

---

[1] Unless otherwise indicated, section references are to the Internal Revenue Code of 1986 (Code), as amended, in effect for the years in issue.  Rule references are to the Tax Court Rules of Practice and Procedure, and monetary amounts are rounded to the nearest dollar.

| [*3] Tax year | Deduction for fees paid to Mr. Dakovich | Deduction for fees paid to Jackson Enterprises Corp. | Deduction for fees paid to Manatt's Enterprises, Ltd. | Total deduction for management fees |
|---|---|---|---|---|
| 2012 | $166,000 | $500,000 | $500,000 | $1,166,000 |
| 2013 | 150,000 | 800,000 | 800,000 | 1,750,000 |
| 2014 | 200,000 | 800,000 | 800,000 | 1,800,000 |

FINDINGS OF FACT

I. Background

Some of the facts have been stipulated and are so found, and they are incorporated in our findings by this reference. At all relevant times petitioner was a corporation incorporated under Iowa law and treated as a subchapter C corporation for Federal income tax purposes. When the petition was timely filed, petitioner's principal place of business was in Iowa.

During the tax years in issue[2] petitioner operated an asphalt paving business in Waterloo, Iowa, with 66 to 75 employees. It operated two stationary asphalt plants in Waterloo and was limited to projects in the surrounding counties. Most of petitioner's revenue came from contracts with government entities. These public projects are awarded to the low bidder.

---

[2] Unless otherwise specified, the facts found below are for the tax years in issue.

**[*4]** Petitioner had three shareholders: Jackson Enterprises Corp. (owning 40% of the stock), Manatt's Enterprises, Ltd. (owning 40% of the stock), and Mr. Dakovich (owning 20% of the stock). Petitioner did not declare or distribute dividends to any of its shareholders during the years in issue or any prior years.

## II. Milton Dakovich

Mr. Dakovich served as petitioner's president and was responsible for the company's day-to-day management. His responsibilities included project oversight, identifying and bidding on projects, equipment decisions, and personnel matters. In bidding on projects, Mr. Dakovich worked with Brad Blough, petitioner's vice president and project manager. Mr. Dakovich also served on petitioner's board of directors. He had decades of experience working for petitioner, including two decades as president.

Mr. Dakovich did not have a written employment contract and did not receive written appraisals or performance reviews from the board of directors. Mr. Dakovich did not keep any records of hours worked but regularly worked 12-hour days.

[*5] Mr. Dakovich received the following compensation:

| Tax year | Base salary | Bonus | Management fees | Director's fees | Total compensation |
|---|---|---|---|---|---|
| 2012 | $145,760 | $394,000 | $166,000 | $40,000 | $745,760 |
| 2013 | 147,160 | 206,400 | 150,000 | 50,000 | 553,560 |
| 2014 | 151,449 | 336,200 | 200,000 | 50,000 | 737,649 |

His base salary typically increased each year to take into account cost of living changes. His bonuses were paid out of an employee bonus pool that was based on petitioner's profitability. His management fees were set by petitioner's board of directors each year. Additionally, he received director's fees for his service on the board.

## III. Jackson Enterprises Corp. and Related Persons

Jackson Enterprises Corp. was a holding corporation with no operations or employees. It was a subchapter S corporation for Federal tax purposes, and Stephen Jackson was its president.

Jackson Enterprises Corp. owned 98% of Cedar Valley Corp., a company engaged in the concrete paving business in Iowa, Missouri, and Nebraska. Cedar Valley Corp. operated two portable concrete plants and did not work in asphalt paving. Mr. Jackson also was the president of Cedar Valley Corp.

[*6] Cedar Valley Management Corp., a corporation wholly owned by Jeff Rost, provided management services to Cedar Valley Corp. It employed Mr. Jackson, Virginia Robinson, Mr. Rost, William Calderwood, and Michael Cornelius to provide management services to Cedar Valley Corp.

During each year in issue the city of Waterloo had one alternate bid project on which both asphalt and concrete paving companies could bid to obtain the street paving contract. Petitioner was the only bidder for these alternate bid projects and was awarded the project each year.

Over the years Mr. Dakovich routinely contacted Mr. Jackson and Mr. Calderwood for input on how a concrete paving company might bid on the alternate bid project that year. When asked to do so, Mr. Jackson and Mr. Calderwood would review the project plans for the alternate bid project and verbally communicate to Mr. Dakovich what bid a concrete paving company might propose for the project. Mr. Jackson had 35 years of experience bidding for concrete paving projects. Mr. Calderwood was in charge of bidding on concrete paving projects for Cedar Valley Corp. and prepared roughly 150 to 200 bids per year. He spent 5 to 10 hours helping petitioner with the Waterloo alternate bid project each year. Cedar Valley Corp. did not bid on the alternate bid projects during the years in issue because management believed it would not be

[*7] competitive from a cost perspective. But Cedar Valley Corp. did bid on alternate bid projects in other areas; and when it did, Mr. Dakovich often provided advice when asked to do so.

Mr. Cornelius was the vice president of equipment for Cedar Valley Corp. and specialized in various types of concrete paving equipment. He had no expertise in asphalt equipment. Infrequently--perhaps once per year--Mr. Dakovich or petitioner's other employees would contact Mr. Cornelius to ask for equipment-related advice. Occasionally, Mr. Cornelius would contact Mr. Dakovich or someone else working for petitioner to ask whether Cedar Valley Corp. could borrow or rent equipment.

Petitioner, Cedar Valley Corp., Cedar Valley Management Corp., and BMC Aggregates, LC[3] (together, plan participants), participated in a self-insured health plan together. Mr. Rost and Ms. Robinson made decisions regarding the self-insured health plan and worked with the plan's broker, third-party administrator, reinsurer, and wellness provider, as well as employees of the plan participants. TrueNorth, a broker and advisory firm, provided advisory assistance to the plan. TrueNorth billed Cedar Valley Corp. for the services provided, and

---

[3] BMC Aggregates, LC, was owned by Manatt's Enterprises, Ltd. (48.75%), Jackson Enterprises Corp. (48.75%), and Chris Dinsdale (2.5%).

[*8] petitioner paid its share of the costs incurred. UMR, a division of United Health, was the third-party plan administrator for the plan. UMR produced plan documents, received health claims, processed and paid claims, and sent bills for claims and other expenses related to the self-insured health plan to Cedar Valley Corp. Cedar Valley Corp. paid bills and other expenses under the self-insured health plan and then invoiced the other plan participants for their respective portions of the bills and expenses. Mr. Rost and Ms. Robinson also worked on a dental plan, a life insurance plan, and a disability plan for the plan participants. BMC Aggregates, while a participant in these plans, did not pay management fees to Jackson Enterprises Corp., Cedar Valley Corp., or Cedar Valley Management Corp.

Mr. Rost was vice president of finance and chief financial officer of Cedar Valley Corp. While he did not keep records of his time, Mr. Rost spent approximately 25% of his time working on the self-insured health plan.

Ms. Robinson was the human resources manager at Cedar Valley Corp. In addition to her work on the plans described above, Ms. Robinson was responsible for a variety of human resources functions at Cedar Valley Corp. She sometimes provided advice or assistance to petitioner regarding human resources issues. Ms. Robinson did not keep track of the time she spent working on any particular issue

[*9] or set of issues, nor did she keep track of how much time she spent assisting or working on issues related to any entity affiliated with Cedar Valley Corp.

IV. Manatt's Enterprises, Ltd., and Related Persons

Manatt's Enterprises, Ltd., was engaged in a farming operation in Iowa. It was a subchapter C corporation for Federal tax purposes, and it was not engaged in asphalt or road paving. Tim Manatt was its president.

Manaco Corp. was an Iowa corporation that owned 7.6% of the stock of Manatt's Enterprises, Ltd. Manaco Corp. owned 100% of the stock of Manatt's, Inc., a corporation engaged in construction and the production of asphalt, concrete, and related aggregates in Iowa. Tim Manatt worked for Manatt's, Inc., for over 25 years until his retirement in 2005, and Brad Manatt, Tim's brother, was its president. Manatt's, Inc., owned 100% of MAS, Ltd., a company that employs individuals who provide services to Manatt's, Inc., including Brad Manatt, John McKusker, Tim Douglas, and James Bim. Tim Manatt was not employed by Manaco Corp., Manatt's, Inc., or MAS, Ltd., during any of the years in issue.

Tim Manatt was not an officer or employee of petitioner and did not enter into any written consulting or management services agreement with petitioner. However, he made himself available to Mr. Dakovich to advise on petitioner's business matters. He did not track time spent advising on business matters for

[*10] petitioner, nor did he bill or invoice it for services he provided. Tim Manatt lived in Waterloo during construction season, which was generally from early May through October, and in Arizona the rest of the year. While "wintering" in Arizona, Tim Manatt occasionally would talk to Mr. Dakovich on the telephone or via email about petitioner's business. While Tim Manatt was in Waterloo, he generally visited petitioner's office on business days for an hour or two to have morning coffee with Mr. Dakovich and two other individuals not employed by or associated with petitioner, a decades' long tradition referred to as "coffee club" by the participants. Some time was spent socializing, but Tim Manatt would consult with Mr. Dakovich on petitioner's business matters as well, including issues related to bidding, competition, and personnel. Petitioner did not ask or require that Tim Manatt attend the coffee club, and it did not pay management fees to the other two individuals who attended. Whether Tim Manatt was in Arizona or Iowa, no records were kept documenting the frequency, duration, nature, or substance of his discussions with Mr. Dakovich.

In addition to advising on petitioner's business, Tim Manatt also was involved in political activities surrounding Iowa's Local Option Sales Tax (LOST). The LOST was a sales tax that was used in Waterloo to fund road construction and road maintenance. In 2002 a public referendum considered

[*11] whether to split the proceeds of the LOST in the Waterloo area between road construction and a waterfront revitalization project. Tim Manatt worked with a group to oppose the referendum by encouraging the general public to vote against it. Petitioner did not hire Tim Manatt to advocate against the LOST referendum, nor did he hold himself out as petitioner's agent when he sought to influence voters to oppose it. The 2002 referendum ultimately failed, and the LOST in the Waterloo area continued to be used for road construction and repairs. Tim Manatt did not undertake any activities with respect to the LOST during the tax years in issue.

Petitioner owned an investment account with Vanguard with a portfolio of nine Vanguard mutual funds. The balance in the account as of the end of 2011 was $1,858,948. The balance grew to $2,072,861 as of the end of 2012, $2,306,650 as of the end of 2013, and $2,540,366 as of the end of 2014. While Tim Manatt did not have any formal training or education in investment management, he monitored and managed petitioner's Vanguard account. He took a buy-and-hold approach to investing in mutual funds; he did not actively trade funds. He rebalanced the portfolio of mutual funds twice during 2013 and once during 2014 but not during 2012. He did not track his time spent monitoring petitioner's Vanguard account, nor did he bill or invoice petitioner for his services.

**[\*12]** There is no written agreement between petitioner and Tim Manatt regarding his management of the Vanguard account.

Mona Bond, an environmental specialist employed by Manatt's, Inc., provided environmental-related services to Manatt's, Inc., and certain associated entities, including petitioner. At various times she was available for petitioner to consult regarding environmental issues, such as stormwater runoff at its stationary asphalt plants. Ms. Bond provided environmental compliance information, PowerPoint presentations, and emails to entities associated with Manatt's, Inc., including petitioner. She also visited various plant sites owned by entities associated with Manatt's, Inc., including petitioner, at least once per year. Petitioner did not enter into any written contract for services from Ms. Bond or Manatt's, Inc. Ms. Bond did not keep any records of her time spent providing environmental advice or services to petitioner, and neither she nor Manatt's, Inc., billed or invoiced it for any such advice or services. Lastly, Ms. Bond's filings with Iowa regulators, required because she was a registered lobbyist, did not identify petitioner as one of her clients.

Dan Boyer, an employee of MAS, Ltd., provided safety-related services to Manatt's, Inc. At various times Mr. Boyer provided safety advice and services to petitioner, such as visiting its project sites and asphalt plants to perform safety

[*13] functions.  Petitioner did not enter into any written contract for safety-related services from Mr. Boyer, MAS, Ltd., or Manatt's, Inc.  There are no records, invoices, or bills detailing the extent, cost, or specific nature of the services provided.

John McKusker was a licensed bonding agent in Iowa who owned and operated a bonding brokerage service business known as McKusker & Associates.  McKusker & Associates regularly provided bonding services to Manatt's, Inc., as well as petitioner, including helping petitioner obtain bid bonds, performance bonds, and payments bonds.  McKusker & Associates worked with Holmes & Murphy, a bonding agent, to obtain petitioner's bonds and with NAS Surety, a bonding company, to obtain insurance for those bonds.  McKusker & Associates also helped petitioner obtain a fidelity bond for petitioner's retirement program from Merchant's Bonding Co.

To obtain bonds petitioner was required to submit financial statements and project information to McKusker & Associates, the bonding companies, and the insurer.  Manatt's Enterprises, Ltd., was not named on petitioner's bonds, and it did not guarantee them.  Nor did it have to provide financial statements or financial information in connection with petitioner's bonds or insurance.  Neither Manatt's Enterprises, Ltd., nor petitioner's other two shareholders appeared to

[*14] bear any risk with respect to petitioner's bonds. And petitioner did not default on any of its bonds during the years in issue.

Petitioner paid McKusker & Associates for the bonding services provided to it by Mr. McKusker. McKusker & Associates in turn paid Holmes & Murphy, NAS Surety, and Merchant's Bonding Co. for their respective services, and retained its commission on the transactions.

Petitioner's employees attended "best practices" meetings with employees of Manatt's, Inc., and other affiliated companies. These meetings were held once annually, with smaller group "break out" sessions occurring two to three times per year. The purpose of the meetings was to gather employees from the various companies together to discuss best practices in the construction industry.

Manatt's, Inc., dredged sand at one of petitioner's asphalt plants. Petitioner paid Manatt's, Inc., for the dredging services it provided.

Petitioner purchased black liquid binding product from Bituminous Material & Supply, an entity unrelated to petitioner or its shareholders. It received prices that were the same as or similar to the prices Manatt's, Inc., paid for black liquid binding product.

Petitioner owned a 20% interest in an oil recycling company called Valley Environmental, LLC, from which it purchased recycled oil over the years. Valley

[*15] Environmental, LLC, had four other owners,[4] including Manatt's, Inc., but not Manatt's Enterprises, Ltd.

V. Management Fees Petitioner Paid to Shareholders

Petitioner's board of directors had seven members in tax year 2012: Mr. Dakovich, Mr. Jackson, Mr. Rost, Mr. Calderwood, Tim Manatt, Merlin Manatt (Tim's uncle), and Brad Manatt. During 2013 and 2014 petitioner's board had the same members, less Mr. Calderwood and Merlin Manatt. Petitioner's board of directors met three times per year.

Petitioner did not enter into any written management or consulting services agreements with any of its three shareholders. No management fee rate or billing structure was negotiated or agreed to between the shareholders and petitioner at the beginning of any of the years in issue. And none of the shareholders invoiced or billed petitioner for any services provided. Instead, petitioner's board of directors would approve the management fees to be paid to the shareholders at a board meeting later in the tax year, when the board had a better idea how the company was going to perform and how much earnings the company should retain. The board minutes do not reflect how these determinations were made.

---

[4] Manatt's, Inc., two of its affiliates, and an unidentified individual were the other owners of Valley Environmental, LLC.

**[*16]** The board did not attempt to value or quantify any of the services performed by Manatt's Enterprises, Ltd., or Jackson Enterprises Corp. but instead approved a lump-sum management fee for each shareholder for each year. The amounts were not determined after considering the services performed and their values. The management fees paid to each entity were always equal each year, even though the services provided might vary from year to year. Nothing in the record explains the fluctuation in management fees paid to each entity from $500,000 in tax year 2012 to $800,000 in tax years 2013 and 2014.

Neither did the fees represent payment for any particular service Mr. Dakovich provided. Instead, the board approved Mr. Dakovich's management fees as an additional reward beyond what he received through the employee bonus pool.

[*17] VI. Financial Statements

On its audited financial statements petitioner reported the following:

| Tax year | Total assets | Total liabilities | Total shareholders equity | Sales | Net income |
|---|---|---|---|---|---|
| 2011 | $18,829,914 | $3,402,594 | $15,427,320 | $25,296,385 | $562,610 |
| 2012 | 18,566,431 | 2,946,503 | 15,619,928 | 25,926,444 | 192,608 |
| 2013 | 19,472,563 | 3,984,345 | 15,488,218 | 22,478,458 | (131,710) |
| 2014 | 20,931,030 | 4,339,663 | 16,591,367 | 23,586,982 | 1,103,149 |

VII. Tax Returns

Petitioner filed Form 1120, U.S. Corporation Income Tax Return, for each of the tax years in issue. Petitioner was an accrual method taxpayer. For tax year 2012 petitioner reported gross receipts of $25,926,444 and taxable income of $141,712. For tax year 2013 petitioner reported gross receipts of $22,478,458 and taxable income of $281,371. For tax year 2014 petitioner reported gross receipts of $23,586,982 and taxable income of $524,358.

Respondent's deficiency determinations result from the complete disallowance of petitioner's claimed management fee deductions and allowance of section 199 deductions.

**[*18]**                                                    OPINION

I.  Burden of Proof

The taxpayer generally bears the burden of proving that the Commissioner's determinations in a notice of deficiency are erroneous.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  The taxpayer also bears the burden of proving entitlement to any deductions claimed.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).  The Code and the regulations thereunder require the taxpayer to maintain records sufficient to establish the amount of any deduction claimed.  See sec. 6001; sec. 1.6001-1(a), Income Tax Regs.

The burden of proof may shift from the taxpayer to the Commissioner in certain circumstances.  Under section 7491(a)(1), "[i]f, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B, the Secretary shall have the burden of proof with respect to such issue."  See Higbee v. Commissioner, 116 T.C. 438, 442 (2001).  Petitioner makes no argument that the conditions for shifting the burden of proof have been met.  Petitioner therefore bears the burden of proof.

**[*19]** II.  Section 162 Deduction

A subchapter C corporation, such as petitioner, is subject to Federal income tax on its taxable income, which is its gross income less allowable deductions. Secs. 11(a), 61(a)(1) and (2), 63(a).  A corporation may deduct all the ordinary and necessary expenses paid or incurred during the tax year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered.  Sec. 162(a)(1); sec. 1.162-7(a), Income Tax Regs.  An expense is ordinary if it is customary or usual within a particular trade, business, or industry or relates to a transaction "of common or frequent occurrence in the type of business involved."  Deputy v. du Pont, 308 U.S. 488, 495 (1940). An expense is necessary if it is appropriate and helpful for the development of the business.  See Commissioner v. Heininger, 320 U.S. 467, 471 (1943).  Whether an expense is ordinary and necessary is generally a question of fact.  Id. at 475.

In testing whether compensation is deductible we consider whether the payments "are in fact payments purely for services."  Sec. 1.162-7(a), Income Tax Regs.  This is a question of fact to be determined from all the facts and circumstances.  Am. Sav. Bank v. Commissioner, 56 T.C. 828 (1971).  Section 1.162-7(b)(1), Income Tax Regs., explains that distributions to shareholders disguised as compensation are not deductible:

[*20] Any amount paid in the form of compensation, but not in fact as the purchase price of services, is not deductible. An ostensible salary paid by a corporation may be a distribution of a dividend on stock. This is likely to occur in the case of a corporation having few shareholders, practically all of whom draw salaries. If in such a case the salaries are in excess of those ordinarily paid for similar services and the excessive payments correspond or bear a close relationship to the stockholdings of the officers or employees, it would seem likely that the salaries are not paid wholly for services rendered, but that the excessive payments are a distribution of earnings upon the stock. * * *

Courts closely scrutinize compensation paid by a corporation to its shareholders to ensure the payments are not disguised distributions. Charles Schneider & Co. v. Commissioner, 500 F.2d 148, 152 (8th Cir. 1974) ("[W]here the corporation is controlled by the very employees to whom the compensation is paid, special scrutiny must be given to such salaries, for there is a lack of arm's length bargaining[.]"), aff'g T.C. Memo. 1973-130; Heil Beauty Supplies, Inc. v. Commissioner, 199 F.2d 193, 194 (8th Cir. 1952) ("Any payment arrangement between a corporation and a stockholder * * * is always subject to close scrutiny for income tax purposes, so that deduction will not be made, as purported salary, rental or the like, of that which is in the realities of the situation an actual distribution of profits.").

In the Court of Appeals for the Eighth Circuit, where an appeal would lie in this case, the issue of whether or to what extent compensation paid by a

[*21] corporation to its shareholders represents compensation for services or constitutes a distribution of profits is a determination of a "matter purely of fact." Heil Beauty Supplies, Inc. v. Commissioner, 199 F.2d at 195 (quoting Twin City Tile & Marble Co. v. Commissioner, 32 F.2d 229, 231 (8th Cir. 1929)).  In determining whether the compensation paid to a corporation's shareholders is instead a distribution of profit we consider all the facts and circumstances.  Id. And we are not "compelled to accept at face value the naked, interested testimony of the corporation or the stockholder[s], merely because that testimony is without direct contradiction by other witnesses".  Id.

In addition to being for services the amount allowed as compensation may not exceed what is reasonable under all the circumstances.  Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1155 (1980); sec. 1.162-7(b)(3), Income Tax Regs.  The regulations state that generally, reasonable and true compensation is only such an amount as would ordinarily be paid for like services by like enterprises under like circumstances.  Sec. 1.162-7(b)(3), Income Tax Regs.  The reasonableness of the amount also is a question of fact to be determined from the record in each case.  Charles Schneider & Co. v. Commissioner, 500 F.2d at 151; Estate of Wallace v. Commissioner, 95 T.C. 525 (1990), aff'd, 965 F.2d 1038 (11th Cir. 1992).  Finally, the test of reasonableness

**[\*22]** is not applied to the shareholders as a group but rather to each shareholder's compensation in the light of the individual services performed. L. Schepp Co. v. Commissioner, 25 B.T.A. 419 (1932).

A. Payment for Services Requirement

Petitioner has not shown that the management fees were paid "purely for services." See sec. 1.162-7(a), Income Tax Regs. To the contrary, most of the evidence indicates that petitioner paid the management fees to its three shareholders as disguised distributions. See id. para. (b)(1). Petitioner made no distributions to its three shareholders but paid management fees each year. Indeed, no evidence indicates that petitioner ever made distributions to its shareholders during its entire corporate history. This indicates a lack of compensatory purpose. See id.; see also Paul E. Kummer Realty Co. v. Commissioner, 511 F.2d 313, 315 (8th Cir. 1975) ("[T]he absence of dividends to stockholders out of available profits justifies an inference that some of the purported compensation really represented a distribution of profits as dividends."), aff'g T.C. Memo. 1974-44; Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 362-363 (9th Cir. 1974) (holding that the complete absence of formal dividend distributions was an indication that compensation paid to shareholders was disguised distributions), aff'g T.C. Memo. 1971-200; Charles Schneider & Co. v.

[*23] Commissioner, 500 F.2d at 153 ("Perhaps most important [in finding purported shareholder compensation represented disguised distributions] is the fact that no dividends were ever paid by any of these companies during * * * [the years in issue], even though they enjoyed consistent profits and immense success in the industry.").

Although the management fees were not exactly pro rata among the three shareholders, the two large shareholders always got equal amounts, and the percentages of management fees all three shareholders received roughly correspond to their respective ownership interests. This equal distribution supports an inference that petitioner paid management fees to Mr. Dakovich, Jackson Enterprises Corp., and Manatt's Enterprises, Ltd., as distributions of profits. See sec. 1.162-7(b)(1), Income Tax Regs.; see also Paul E. Kummer Realty Co. v. Commissioner, 511 F.2d at 316 (stating that the fact that amounts received by shareholders were "almost identical" to the percentage of stock held by each shareholder was indicative of disguised distributions). The management fees paid have a close relationship with each shareholder's stockholding in petitioner.

Specifically, Mr. Dakovich owned 20% of petitioner's stock and received 14% of the total management fees for tax year 2012, 8% of the total management

[*24] fees for tax year 2013, and 11% of the management fees for tax year 2014. Jackson Enterprises Corp. and Manatt's Enterprises, Ltd., each owned 40% of petitioner's stock and each received management fees of: 43% for tax year 2012, 46% for tax year 2013, and 44% for tax year 2014. Jackson Enterprises Corp. and Manatt's Enterprises, Ltd., always received the same amounts in management fees despite the different and varying services provided to petitioner each tax year. The fact that management fees paid to each of Jackson Enterprises Corp. and Manatt's Enterprises, Ltd., were always the same indicates that management fees were determined on the basis of their equal ownership interests, not on a good faith valuation of the services they provided.

The fact that petitioner paid Jackson Enterprises Corp. and Manatt's Enterprises, Ltd., instead of the entities and individuals actually performing services indicates a lack of compensatory purpose. If petitioner was concerned with paying for services, it very easily could have paid the service providers directly whether that was Cedar Valley Corp., Manatt's, Inc., Tim Manatt, or someone else. But instead petitioner paid entities that did not directly perform any of the services that it argues justify the management fees.

Also, petitioner paid management fees as lump sums at the end of the tax year, rather than throughout the year as the services were performed, even though

[*25] many services were performed throughout, or early in, the tax year. For example, petitioner argues that the management fees paid to Jackson Enterprises Corp. are partly attributable to the human resources assistance Ms. Robinson provided and that the management fees paid to Manatt's Enterprises, Ltd., were partly attributable to environmental assistance Ms. Bond provided. But petitioner paid nothing for those services until the very end of the tax year. This practice indicates a lack of compensatory purpose. See Nor-Cal Adjusters v. Commissioner, 503 F.2d at 362-363 (holding that taxpayer's payments of compensation to shareholders in lump sums rather than as services were performed was an indication that payments were disguised distributions); Heil Beauty v. Commissioner, 199 F.2d at 195 (concluding that the taxpayer's payment scheme was indicative of a disguised distribution of profit where the shareholder was paid in one lump sum each year as opposed to throughout the year as services were rendered).

Another indication that the management fees were disguised distributions to the shareholders is the fact that petitioner had relatively little taxable income after deducting the management fees. See Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1325-1326 (5th Cir. 1987) (stating that considering compensation as a percentage of taxable income before deducting the compensation in question

[*26] is an accurate gauge of whether a corporation is disguising distributions of dividends as compensation), aff'g T.C. Memo. 1985-287; Nor-Cal Adjusters v. Commissioner, 503 F.2d at 362-363 (holding that the fact that the taxpayer consistently had negligible taxable income was an indication that compensation paid to shareholders was disguised distributions); Wycoff v. Commissioner, T.C. Memo. 2017-203, at *46-*49 (holding that shareholder compensation paid was unreasonable when it depleted "most, if not all" of the company's profits, an indication that the compensation was a disguise for nondeductible profit distributions). Without deducting management fees petitioner would have had taxable income of $1,307,712 for tax year 2012, $2,031,371 for tax year 2013, and $2,324,358 for tax year 2014. The management fees of $1,166,000 for tax year 2012, $1,750,000 for tax year 2013, and $1,800,000 for tax year 2014 thus eliminated 89%, 86%, and 77% of what would have been petitioner's taxable income for tax years 2012 through 2014, respectively. One of petitioner's board members, Brad Manatt, credibly testified that he understood a dividend to be a "distribution of profits"; and when he was asked to describe his understanding of the difference between a dividend and a management fee, he testified that "a management fee is a distribution from the company that's not taxed by the company and a distribution is a [sic] after-tax distribution of profits. * * * They're

[*27] both distributions." It is not a stretch to infer that petitioner was using management fee payments to lower its taxable income while getting cash to its three shareholders.

Lastly, petitioner's process of setting management fees was unstructured and had little if any relation to the services performed. The fees for services were not set in advance of the services' being provided. None of the witnesses could explain how petitioner determined the management fees. And there was contradictory testimony on who proposed the initial amount of management fees at the board meetings: For instance, Mr. Dakovich recalled that the amounts of the management fees were determined by the board after a discussion. On the other hand some board members testified that Mr. Dakovich made a recommendation of the amount of the management fees at the board meeting, and after a brief discussion they would be approved. Some board members understood that the management fees had been determined before the board meetings and did not recall discussions about the different services performed. Tim Manatt vaguely speculated that the higher fees in 2013 were to make up for the lack of fees in 2010, but on brief petitioner was unable to stitch together any more evidentiary support. Petitioner did not attempt to value the individual services attributable to the management fees paid to Jackson Enterprises Corp. and Manatt's Enterprises,

[*28] Ltd.  And Mr. Dakovich conceded that his management fees were not paid for any specific services he performed beyond his duties as petitioner's president. This unstructured process for setting management fees indicates that petitioner paid management fees as a way to distribute earnings to its shareholders and not to compensate them for services rendered.  See Nor-Cal Adjusters v. Commissioner, 503 F.2d at 362-363 (holding that an unstructured system of setting shareholder compensation, with no preset criteria, indicated that the shareholder compensation was actually disguised distributions).

The numerous indicia of disguised distributions show that the management fees paid to the three shareholders were not "in fact payments purely for services." See secs. 1.162-7(a) and (b)(1), Income Tax Regs.  Accordingly, we hold that the management fees are not deductible, even if petitioner could show the amounts were reasonable.  See Charles Schneider & Co. v. Commissioner, 500 F.2d at 153 (stating that compensation paid to shareholders who set their own compensation "may be distributions of earnings rather than payments of compensation for services rendered; even if they are reasonable, they would not be deductible").

[*29] B.  Reasonableness Requirement

### 1.  Jackson Enterprises Corp. and Manatt's Enterprises, Ltd.

Petitioner also failed to meet its burden of showing that the management fees paid to Jackson Enterprises Corp. and Manatt's Enterprise, Ltd., were ordinary, necessary, and reasonable.  First, the parties did nothing to document a service relationship between petitioner and either Jackson Enterprises Corp. or Manatt's Enterprises, Ltd.  There were no written management services agreements outlining what services were to be performed.  No evidence--documentary or otherwise--outlines the cost or value of any particular service.  Neither corporate shareholder billed or sent invoices for services rendered.  See ASAT, Inc. v. Commissioner, 108 T.C. 147, 174-175 (1997) (holding that the taxpayer was not entitled to deduct consulting fees where there was no written contract, no evidence regarding how the fees were determined, almost no detail in the billing invoices, and indications that the parties were not dealing at arm's length); see also Fuhrman v. Commissioner, T.C. Memo. 2011-236, 2011 WL 4502290, at *2-*3 (holding that the taxpayer was not entitled to deduct management fees paid to an affiliate when there was no written management services contract or other contemporaneous documentation, and the

[*30] invoices had no details as to the services provided or the derivation of the invoiced amounts).

Additionally, petitioner presented no evidence showing how management fee amounts were determined. See Fuhrman v. Commissioner, 2011 WL 4502290, at *2-*3 (holding that the taxpayer was not entitled to deduct management fees paid to an affiliate when the taxpayer failed to demonstrate how the management fees were determined). As we observed above, the testimony about how the amounts of management fees were set was vague and contradictory. No witness could explain how much any particular service cost. No witness could explain how the lump-sum management fee amounts paid to each of Jackson Enterprises Corp. and Manatt's Enterprises, Ltd., were determined. No witness could explain what portion of each management fee paid to either Jackson Enterprises Corp. or Manatt's Enterprises, Ltd., was attributable to any given service.

Reasonable compensation is only the amount that would ordinarily be paid for like services by like enterprises under like circumstances. Sec. 1.162-7(b)(3), Income Tax Regs. Petitioner presented no evidence concerning what like enterprises would pay for like services. Petitioner and its corporate shareholders made no attempt, either during the years in issue or later at trial, to attach dollar values to the individual services provided, let alone demonstrate that like

[*31] enterprises would pay that amount for such services. Petitioner failed to introduce any expert testimony to aid us in assessing the reasonableness of amounts paid for the various services. And petitioner failed to establish the nature, occurrence, and frequency of most of the services that it argues "justify" the management fees paid to its corporate shareholders. Indeed, petitioner's rationale for the management fees appears to be a last-minute scramble to list everything anyone remotely associated with either corporate shareholder did for petitioner. Neither Jackson Enterprises Corp. nor Manatt's Enterprises, Ltd., actually performed any of the "personal services" that petitioner argues justify payment of management fees. See sec. 162(a)(1) (providing for a deduction for compensation paid for "personal services" actually rendered). Neither corporate shareholder was in the business of providing management services or even was in a business related to that of petitioner's. Jackson Enterprises Corp. was a holding company, and Manatt's Enterprises, Ltd., was a farming business. Instead, the services were performed by individuals who worked for different entities. For example, the environmental advice, safety advice, and best practices meetings were provided by employees of MAS, Ltd., or Manatt's, Inc., not Manatt's Enterprises, Ltd. The alternate bid advice, human resources assistance, and equipment advice were performed by employees of Cedar Valley Management

[*32] Corp., not Jackson Enterprises Corp. Petitioner glosses over this by referring to the "Jackson family of companies" and the "Manatt's family of companies."

We have held that management fees paid to an affiliate are only necessary and reasonable--and therefore, deductible--if the affiliate provided the management services. See Elick v. Commissioner, T.C. Memo. 2013-139, at *11-*12 (holding that the taxpayer was not entitled to deduct management fees paid to affiliate when the taxpayer failed to show that management services outlined in management services agreement were actually performed by the affiliate), aff'd, 638 F. App'x 609 (9th Cir. 2016); Weekend Warrior Trailers, Inc. v. Commissioner, T.C. Memo. 2011-105, 2011 WL 1900159, at *19-*21 (holding that management fees paid to an affiliate were not deductible when the evidence did not adequately establish the services performed and who performed them). Petitioner offered no evidence that the entities or individuals providing the services did so on behalf of the shareholders and were compensated for those services; in effect we are asked to imagine their relationships. Petitioner cites no authority for the proposition that it can claim a deduction for management fees paid to its corporate shareholders just because individuals employed by other entities in the "Jackson family of companies" or "Manatt's family of companies"

**[*33]** may have done something of value for petitioner. Petitioner has to connect the dots between the services performed and the management fees it paid. Petitioner failed to do so.

Petitioner's arguments are even less convincing when we consider each "service" it asserts "justifies" the management fees paid to each corporate shareholder.

### a. Alternate Bid Assistance

Petitioner did not establish that it is customary or usual for an asphalt paving company to pay for advice on what a concrete company may bid on an alternate bid project. Petitioner did not establish what amount this service should cost or that like enterprises would pay an amount for advice like this.

### b. Self-Insured Health Plan

Petitioner did not establish whether it is customary or usual for a corporation to pay an affiliate management fees for allowing the corporation's employees to participate in a self-insured health plan. Petitioner did not establish what amounts like enterprises would pay under like circumstances. To the contrary, another plan participant owned by Manatt's Enterprises, Ltd., and Jackson Enterprises Corp., BMC Aggregates, did not pay any management fees to Cedar Valley Corp. or Jackson Enterprises Corp. Moreover, petitioner was billed

**[*34]** by Cedar Valley Corp. for its allocable share of plan expenses, and it paid those bills.

### c. Human Resources Assistance

Petitioner did not establish the specific nature, extent, or cost of the human resource services Ms. Robinson provided. Ms. Robinson, an employee of Cedar Valley Management Corp., did not invoice petitioner for her time or keep any corroborating documentation of time spent.

### d. Equipment Advice

Petitioner did not establish the amount of the management fees paid for equipment advice or that such amount would ordinarily be paid by like enterprises under like circumstances. The testimony at trial was too vague to establish what advice Mr. Cornelius provided to petitioner during the years in issue.

### e. Tim Manatt's Advice

Petitioner did not establish that it is usual or customary for a corporation engaged in asphalt paving to pay consulting fees to a member of its board of directors who made himself available for advice on an ad hoc basis. Petitioner did not establish what amount of the management fees paid to Manatt's Enterprises, Ltd., was attributable to Tim Manatt's assistance, as there was no written consulting or management services agreement or invoices for time worked. Tim

[*35] Manatt's occasional phone calls with Mr. Dakovich when he was wintering in Arizona are explained by his involvement on petitioner's board of directors as well as his indirect ownership interest in petitioner. His daily coffee club visits with Mr. Dakovich during construction season appear to be more social. These coffee club meetings had occurred for decades. And the other two individuals that attended the coffee club meetings received no compensation for their attendance, undermining petitioner's assertion that it was reasonable to compensate Manatt's Enterprises, Ltd., for Tim Manatt's participation.

### f. Lobbying Activity

Additionally, petitioner did not establish that it was customary or usual for an asphalt paving company to compensate an individual for lobbying activities that occurred a decade before the tax year in issue. Petitioner did not establish what amount of the management fees was paid for Tim Manatt's involvement with the Iowa LOST and did not establish that such amount would ordinarily be paid by like enterprises under like circumstances. Tim Manatt's political activities surrounding Iowa's LOST occurred with respect to a public referendum in 2002, approximately a decade before the first tax year in issue. Additionally, because Tim Manatt's efforts with respect to the LOST were to influence the general

[*36] public with respect to a public referendum, any expenses would not be deductible under section 162(a). <u>See</u> sec. 162(e)(1)(C).

### g. Investment Management

Petitioner did not establish what amount of the management fees was paid for Tim Manatt's oversight of its Vanguard account and did not establish that this amount would be paid ordinarily by like enterprises under like circumstances. Additionally, petitioner did not establish that it is customary or usual for an asphalt paving company to compensate an individual with no formal training or education in finance or investing to manage its investment accounts. Also, Tim Manatt's buy-and-hold approach did not appear to be time intensive. Petitioner held the same nine mutual funds in its Vanguard account during the tax years in issue and made only three investment allocation changes during the entire three-year period.

### h. Environmental Advice

Petitioner did not establish the specific nature, extent, or cost of the environmental advice Ms. Bond provided. Ms. Bond, an employee of Manatt's, Inc., did not invoice petitioner for her services or keep any corroborating documentation of time spent. Petitioner did not establish what amount of the management fees was paid for this service.

**[*37]**                              i.  Safety Advice

Petitioner did not establish the specific nature, extent, or cost of the safety-related advice Mr. Boyer provided.  Mr. Boyer, an employee of MAS, Ltd., did not invoice petitioner for his services or keep any corroborating documentation of time spent.  Petitioner did not establish what amount of the management fees was paid for this service.

j.  Bonding

There is no evidence that Manatt's Enterprises, Ltd., provided petitioner with any bonding services.  Petitioner obtained its bonding services from Mr. McKusker, McKusker & Associates, Holmes & Murphy, and NAS Surety, and paid for those services.  There is no evidence that Manatt's Enterprises, Ltd., was in any way involved.  Petitioner did not show that it would be customary or usual to compensate a shareholder for third-party bonding services.  Nor did petitioner establish what like enterprises would pay.

k.  Best Practices

Petitioner did not establish that it was customary or usual for an asphalt paving company to compensate a farming company, Manatt's Enterprises, Ltd., to attend "best practices" meetings with various affiliates.  Petitioner did not

[*38] establish the dollar value of these meetings or show that like enterprises would pay such an amount under like circumstances.

### l. Dredging

Petitioner did not demonstrate how much dredging occurred during the years in issue. And Manatt's, Inc., not Manatt's Enterprises, Ltd., performed the dredging services and received payment from petitioner for those services. Petitioner did not demonstrate that it is usual or customary for a recipient of dredging services to compensate both the company performing dredging services and another company having no involvement in the provision of those services.

### m. Various Discounts

Petitioner argues that the management fees paid to Jackson Enterprises Corp. and Manatt's Enterprises, Ltd., are partly "justified" by various discounts that it received from third-party sellers, including various equipment purchases, black liquid binding purchased from Bituminous Material & Supply, aggregate purchases from BMC Aggregates, or recycled oil purchased from Valley Environmental, LLC, an entity in which it held a 20% ownership interest. Petitioner did not establish that it was customary or usual for an asphalt paving company to compensate a company for helping it obtain discounts from third-party sellers of construction materials and equipment. Petitioner did not establish the

**[*39]** amounts of materials or equipment purchased, or the specific amounts of the discounts.  We cannot identify any "personal services" performed by Manatt's Enterprises, Ltd., or Jackson Enterprises Corp., and petitioner did not establish what amounts of the management fees paid to each shareholder were to compensate for these "services" and whether such amounts would have been paid by like enterprises under like circumstances.

2.  Mr. Dakovich

We now turn to whether the management fees paid to Mr. Dakovich, petitioner's president, were ordinary, necessary, and reasonable.  Unlike the two corporate shareholders, Mr. Dakovich was an employee of petitioner, providing personal services on an ongoing basis.  We do not see any reason to question whether it was ordinary or necessary for petitioner to compensate its president.  But his total compensation still must be reasonable.

In the case of shareholder-employee compensation, courts have considered the following factors:  the employee's qualification; the nature, extent, and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; a comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable

**[*40]** concerns; the taxpayer's salary policy for all employees; and in the case of small corporations with a limited number of officers, the amount of compensation paid to the particular employee in previous years. Charles Schneider & Co. v. Commissioner, 500 F.2d at 152; Mayson Mfg. Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949), rev'g a Memorandum Opinion of this Court; Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. at 1155-1156. No single factor is dispositive of the issue; instead, the Court's decision must be based on a careful consideration of applicable factors in the light of the relevant facts. See Mayson Mfg. Co. v. Commissioner, 178 F.2d at 119.

Some courts have supplemented or completely replaced the multifactor approach for analyzing shareholder-employee compensation with the independent investor test. See Mulcahy, Pauritsch, Salvador & Co. v. Commissioner, 680 F.3d 867 (7th Cir. 2012), aff'g T.C. Memo. 2011-74. The Court of Appeals for the Eighth Circuit has not opined on this test yet. But in cases appealable to that Court of Appeals, we have applied the independent investor test as a way to view each factor. See Wagner Constr., Inc. v. Commissioner, T.C. Memo. 2001-160, 2001 WL 739234, at *22 (examining the factors from the perspective of an independent investor). The independent investor test asks whether an inactive, independent investor would have been willing to pay the amount of disputed

[*41] shareholder-employee compensation considering the particular facts of each case. Miller & Sons Drywall, Inc. v. Commissioner, T.C. Memo. 2005-114, 2005 WL 1200189, at *5. In assessing whether Mr. Dakovich's management fees were reasonable in amount, we find respondent's expert witness report prepared by Ken Nunes (Nunes report) helpful and persuasive. Mr. Nunes is a chartered financial analyst, and we recognized him as an expert in business valuation with experience in valuing compensation arrangements.

### a. Employee's Qualifications and the Nature, Extent, and Scope of Employee's Work

An employee's superior qualifications may justify high compensation for his services. See Wagner Constr., Inc. v. Commissioner, 2001 WL 739234, at *22. And an employee's duties performed, hours worked, and general importance to the success of the company may justify high compensation. Id.

Mr. Dakovich had decades of experience as petitioner's president. He was petitioner's top executive and had wide-ranging management duties touching on virtually every aspect of its operations. And he regularly worked long hours. We conclude that these factors weigh in petitioner's favor.

**[*42]**     b.  General Economic Conditions

A company's performance in the context of prevailing general economic conditions reveals some information about the effectiveness of management.  See id. at *23 (explaining that this "factor helps to determine whether the success of a business is attributable to general economic conditions, as opposed to the efforts and business acumen of the employee").

The Nunes report concluded that economic conditions were relatively stable during tax years 2012 through 2014, the economic environment for road construction was normal, and gross domestic product grew during each year in issue.  No other evidence admitted at trial materially contradicts the conclusions in the Nunes report.  Petitioner's sales over this period fluctuated year to year but decreased overall by 7% over the three-year period.  The normal economic conditions and relatively modest sales decline weigh slightly against petitioner.

c.  Prevailing Rates of Compensation for Comparable Positions in Comparable Companies

Perhaps the most significant factor is a comparison of the shareholder-employee compensation with prevailing rates of compensation paid to individuals in similar positions in comparable companies within the same industry.  See Charles Schneider & Co. v. Commissioner, 500 F.2d at 154 (affirming Tax Court's

[*43] holding that shareholder-executive compensation was excessive when the record included evidence that compensation paid by the taxpayer was "grossly disproportionate" to the rates of compensation paid to executives in similarly sized companies in the taxpayer's industry).

The Nunes report contained executive compensation survey data from the 2012 Executive Compensation Survey of Contractors published by PAS, Inc. (PAS Survey). Mr. Nunes specifically used the PAS Survey information for the construction industry and factored in adjustments for the highway segment, petitioner's size as measured by revenues, and petitioner's geographic location. The Nunes report concluded that on average petitioner's industry peers paid total annual compensation of $286,593 to their presidents. Presidents at industry peers in the first quartile received less than $169,820 in total annual compensation. The median total annual compensation paid to presidents was $229,586. And presidents at industry peers in the third quartile received no less than $340,369.

For each tax year in issue, Mr. Dakovich received a salary, a bonus from an employee bonus pool, and management fees. The management fees petitioner paid to him were not meant to compensate him for any unique services outside the scope of his responsibilities as president but instead served essentially as additional bonus compensation. Without taking into account the management

**[*44]** fees, Mr. Dakovich was highly compensated relative to presidents at petitioner's industry peers. His average annual salary and bonus was $460,323, exceeding the industry average and median by a substantial margin. Considering only Mr. Dakovich's salary and bonus, the Nunes report concluded that Mr. Dakovich was overcompensated by approximately $215,000 annually during tax years 2012 through 2014. We find Mr. Nunes' analysis and conclusion instructive. Because the management fees paid to Mr. Dakovich were ostensibly additional compensation for services that he performed as petitioner's president--services for which he was already highly compensated in comparison to peer companies--the entire amount of management fees paid to Mr. Dakovich appears unreasonable. Therefore, we conclude that this factor weighs heavily against petitioner.

> d. <u>Comparison of Salary Paid with Gross Income and Net Income</u>

Courts also have compared compensation paid to shareholder-employees to gross income and net income in deciding whether compensation is reasonable. See <u>Owensby & Kritikos, Inc. v. Commissioner</u>, 819 F.2d at 1322-1323; <u>Wagner Constr., Inc. v. Commissioner</u>, 2001 WL 739234, at *25. Computing shareholder compensation paid as a percentage of net income before shareholder compensation

**[\*45]** is paid often is more probative as it can show whether the shareholder compensation is actually a disguised distribution of profits.  Wagner Constr., Inc. v. Commissioner, 2001 WL 739234, at \*25 (citing Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1325-1326).

Petitioner's total shareholder compensation[5] was 90%[6] of net income for tax year 2012, over 100% of net income for tax year 2013, and 67% of net income for tax year 2014.  We hold that this factor weighs against petitioner.  See Miller & Sons Drywall, Inc. v. Commissioner, 2005 WL 1200189, at \*13 (holding that this factor weighed in favor of the Commissioner when shareholder compensation was 89%, 108%, and 74% of net income before taxes and shareholder compensation for the years in issue).

---

[5] Total shareholder compensation is Mr. Dakovich's total compensation (salary, bonus, and management fees) plus the management fees paid to the other two shareholders, which was $1,705,760 for tax year 2012, $2,103,560 for tax year 2013, and $2,287,649 for tax year 2014.

[6] To compute these percentages, we divided the total shareholder compensation each year by the sum of (i) the net income reported on petitioner's audited financial statements and (ii) total shareholder compensation.  Petitioner had net income of $192,608 for 2013, a net loss of $131,710 for 2013, and net income of $1,103,149 for 2014.

**[*46]**                    e. <u>Comparison of Salary to Distributions to Stockholders and Retained Earnings</u>

As discussed above, the failure to pay more than a minimal amount of dividends may suggest that some of the amount paid as shareholder-employee compensation is a dividend. See <u>Charles Schneider & Co. v. Commissioner</u>, 500 F.2d 148. A corporation is not required to pay dividends, however; shareholders may be equally content with appreciation of their stock. See <u>Home Interiors & Gifts, Inc. v. Commissioner</u>, 73 T.C. at 1161. The independent investor test is used often to assess whether the amount of shareholder compensation was reasonable in the light of the return on equity the corporation's shareholders received during the same timeframe. <u>Miller & Sons Drywall, Inc. v. Commissioner</u>, 2005 WL 1200189, at *5 (citing <u>Rapco, Inc. v. Commissioner</u>, 85 F.3d 950, 955 (2d Cir. 1996), <u>aff'g</u> T.C. Memo. 1995-128).

Petitioner never paid dividends. And while petitioner argues correctly that it was not required to pay dividends, it did not show that the shareholders received a fair return on account of their shares. Petitioner did not present evidence or expert witness testimony regarding what return on equity an independent investor might find reasonable. And while we can calculate petitioner's return on equity, we do not have sufficient information to assess whether such a return was

[*47] adequate for petitioner's industry. See id. at *13 n.4 (calculating return on equity by dividing the year's net income by the year's beginning shareholders equity).[7]

Additionally, the Nunes report contains data and analysis that indicates that petitioner's shareholder compensation scheme did not allow for adequate shareholder returns. The Nunes report concludes that petitioner's operating income margins were significantly below those of its industry peers. The top quarter of petitioner's industry peers had operating margins of 6% of revenue during the years in issue, while half had operating margins of more than 2.5%. Petitioner's operating margins before paying management fees were strong compared to those of its industry peers (4.4% in tax year 2012, 7.6% in tax year 2013, and 8.1% in tax year 2014) but were relatively very weak once management fees were paid (negative 0.1%, negative 0.2%, and 0.4%), as computed by the Nunes report. While the Nunes report does not compare petitioner's return on equity to those of its industry peers, we find its conclusions regarding petitioner's operating margins illuminating. By paying such high shareholder compensation, petitioner was less profitable as illustrated by its lower operating income margins

---

[7] Here, that formula indicates returns of approximately 1% for tax year 2012, -1% for tax year 2013, and 7% for tax year 2014.

[*48] compared to those of its industry peers. Low profitability led to relatively lower retained earnings and, consequently, low returns for the hypothetical independent investor. At bottom, petitioner has not shown that a hypothetical independent investor in its stock would find its investment returns reasonable with the shareholder compensation.[8] Accordingly, we find that this factor weighs heavily in favor of respondent.

In sum, petitioner has not carried its burden of showing that the management fees paid to Mr. Dakovich were reasonable. They were not for any services beyond his responsibilities as president, and respondent has provided persuasive expert testimony that Mr. Dakovich was already overcompensated by his salary and bonus alone. As we concluded above, there are numerous indicia that the management fees paid to Mr. Dakovich were simply disguised distributions; and much of the evidence supports the conclusion that the management fees paid to him were not reasonable. Finally, petitioner never paid dividends to its shareholders and presented no evidence showing that an independent investor would have been satisfied with investment returns after shareholder compensation.

---

[8] And we think that conclusion applies equally to management fees paid to all three shareholders, not just Mr. Dakovich.

**[*49]** III.  Conclusion

For the reasons stated above, we sustain respondent's disallowance of petitioner's claimed deductions for management fees paid to its three shareholders for tax year 2012, tax year 2013, and tax year 2014.

We have considered all of the arguments made by the parties and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

An appropriate decision will be entered.